KYU SON YI, DVM, Petitioner

v.

STATE BOARD OF VETERINARY
MEDICINE, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 10, 2008.

Decided Nov. 19, 2008.

Joseph A. Breymeier, Philadelphia, for petitioner.

Teresa Lazo, Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Kyu Son Yi, D.V.M., petitions for review of an adjudication of the State Board of Veterinary Medicine (Board) revoking his license to practice veterinary medicine on the basis of malpractice and inadequate patient record-keeping. In rendering this adjudication, the Board rejected the substance of the prosecution staff's expert testimony and, instead, used the knowledge of its individual Board members, who are veterinarians, to make findings of fact critical to its adjudication. The principal question we consider in this case is whether, in rendering an adjudication, an agency's use of facts not placed on the record but known to the professional members of the agency's governing board is an appropriate exercise of the agency's expertise.

## BACKGROUND

The basic facts, which are not disputed, concern Dr. Yi's treatment of Mowgli, a 5–year old Pomeranian owned by Nadine Masters. On July 31, 2003, Masters brought Mowgli to Dr. Yi, who had never before seen the dog. Mowgli presented with multiple fractures to his left hind leg, some of which pierced the skin. The fractures had occurred several days earlier, which was known because the tissue around the fracture site had developed gangrene. After placing Mowgli under anesthesia, Dr. Yi cleaned the wound; removed the gangrenous tissue; applied an antibiotic wound dressing; immobilized the leg with a splint and stocking and injected analgesics for pain relief. The next day, August 1, 2003, Dr. Yi discharged Mowgli, dispensing phenylbutazone and aspirin for pain and vitamin tablets because Masters reported that Mowgli had a poor appetite. Dr. Yi advised Masters that the splint was

temporary and that she must return no later than August 9, 2003, once she had decided on a course of treatment, including a possible amputation. Masters was given printed instructions on the care of a splint, which included a list of warning signs, such as discomfort or movement of a splint, that required prompt attention by a veterinarian. When Masters did not return to his office by August 9th, Dr. Yi called Masters and left messages on her phone.

On August 21, 2003, Masters appeared at Dr. Yi's office with Mowgli, whose leg was in far worse condition. Masters had attempted to reapply the splint. At that point, the only option was amputation, and it was scheduled for the next day. However, without explanation, Masters returned the following morning and took Mowgli to another veterinarian at Wissahickon Creek Animal Hospital. There, Mowgli's leg was amputated.[1]

Three years later, the Bureau of Professional and Occupational Affairs (Bureau) initiated an enforcement action against Dr. Yi with a six-count order to show cause, in which the Bureau alleged:

10. The Respondent did not offer to take or take radiographs of Mowgli's leg.

11. The Respondent did not perform a complete physical examination of Mowgli.

12. The Respondent [did] not recommend, offer to perform or perform surgical repair of Mowgli's fractured leg.

13. The Respondent did not prescribe pain medication for Mowgli.

---

1. Mowgli's records from Wissahickon show that Masters did not return to Wissahickon for Mowgli's post-operative follow-up ap-

pointment, and she did not pay all of Wissahickon's charges for Mowgli's surgery.

14. The Respondent did not refer Ms. Masters to a surgeon capable of surgically repairing Mowgli's leg.

Order to Show Cause, ¶¶ 10–14; Reproduced Record at 3a (R.R. ___). Based on these factual allegations, the Bureau charged Dr. Yi with five deviations "from the standards of acceptable and prevailing veterinary medical practice in [the] care and treatment of Mowgli" (Counts I–V). Order to Show Cause, ¶ 27; R.R. 4a. In Count VI of the Order to Show Cause, the Bureau charged Dr. Yi with failure to maintain appropriate veterinary medical records. Dr. Yi denied the above-quoted allegations of malpractice but did not specifically deny the allegation that his records on Mowgli did not meet Bureau standards.[2]

At the hearing before the Board, the Bureau called Dr. Yi to testify, as on cross.[3] Dr. Yi explained that he came to this country in 1971 and has been licensed by the Commonwealth to practice veterinary medicine since 1976. With respect to Mowgli, Dr. Yi testified that on July 31 he did a general physical examination, looking at Mowgli's "temperature, pulse, respiratory, eye, nose, ear, mouth, teeth, legs, abdominal, skin, everything that's a general thing." Notes of Testimony 10/10/06, at 12 (N.T. ___); R.R. 26a. The Bureau's counsel then reviewed Dr. Yi's medical records on Mowgli with Dr. Yi. The records described Mowgli's leg fractures; the gangrene; the splinting of the leg; the pain medications administered and prescribed; the possibility of an amputation; the follow up appointment for August 8, 2003; and the calls made by Dr. Yi to Masters when Masters did not return. When questioned by the Bureau, "[H]ow did you set the bone?," Dr. Yi answered "I cannot set the bone." N.T. 16; R.R. 30a. He explained that he applied "the plastic splint and stocking" to stabilize the leg and reduce Mowgli's pain but "not for healing or treating." N.T. 17; R.R. 31a. Dr. Yi testified that he recommended an x-ray of the leg and informed Masters that surgery was necessary. Dr. Yi conceded that his patient records did not record the findings of Mowgli's general physical; Masters' refusal of an x-ray; or Mowgli's overnight stay on August 21, 2003.

On redirect, by his own counsel, Dr. Yi again confirmed that he informed Masters, several times, that Mowgli's leg could not be repaired except by surgery and that an x-ray was necessary to determine what surgery, possibly amputation, was appropriate. Dr. Yi again explained that the splint was not intended to repair Mowgli's compound fractures but to give Masters the chance to get another opinion and to discuss the matter with her family. With respect to his patient records, Dr. Yi explained that in 2003, when he saw Mowgli, it had been his practice to record only abnormal findings. Accordingly, he did not record the results of Mowgli's general physical exam or his discussions with Masters. Dr. Yi also explained that in 2005, two years after he saw Mowgli, he settled a Bureau action brought against him for improper record-keeping by submitting his records to the Board for a period of six months; the Board had found them acceptable. Dr. Yi testified that it was his

---

2. With respect to factual allegations relating to Count VI, Dr. Yi responded that his records speak for themselves but denied the Bureau's allegation that they did not record treatment options for Mowgli.

3. The Bureau did not subpoena or call Masters to be a witness. Instead, the Bureau relied solely upon the testimony of Dr. Yi for the factual account of the events related to his treatment of Mowgli.

belief that his patient records made after 2005 have complied with Board regulations.

Next, the Bureau introduced the testimony of its expert witness, Christine M. Runnels, D.V.M., who also prepared an expert report for the Bureau. Her report stated that "unless Ms. Masters refused x-rays and appropriate fracture care, this case reflects incompetency and/or negligence." N.T. 93; R.R. 107a.[4] Dr. Runnels then testified that if Masters refused an x-ray, then Dr. Yi did not deviate from the prevailing standards of veterinary medical practice and, moreover, did not commit malpractice. Indeed, she testified that a veterinarian cannot force an owner to treat an animal. The Bureau questioned Dr. Runnels about the availability of financial assistance from rescue organizations, and she replied that she has never had any success with these organizations where, as in the case of Mowgli, the animal in need has an owner. Dr. Runnels testified that if Mowgli's owner refused to give permission for an x-ray or surgical repair, then the only options were amputation or euthanasia.

In addition, Dr. Runnels testified about Dr. Yi's splinting of Mowgli's leg. She explained that a splint is an acceptable way to stabilize a leg until a decision is made on whether to proceed with corrective surgery or amputation. Dr. Runnels testified that although she prefers analgesic drugs that are more expensive, the drug prescribed by Dr. Yi, phenylbutazone, is an appropriate analgesic, albeit painful when injected intramuscularly. Dr. Runnels stated that she would have advised Masters to return sooner than a

week and that she also uses printed discharge instructions for the care of splints that are similar to those issued by Dr. Yi to Masters. Finally, Dr. Runnels testified that had Masters followed up with Dr. Yi on or before August 9, 2003, Dr. Yi may have been able to save Mowgli's leg.

Dr. Runnels listened to Dr. Yi's testimony regarding his treatment of Mowgli. Dr. Runnels stated that she had no reason not to believe his testimony that he did a general physical; offered to do an x-ray; and discussed a surgical repair, as well as amputation, with Mowgli's owner. She observed, however, that the results of Mowgli's physical and a recital of Dr. Yi's proposed treatment options that were discussed with, and refused by, Masters were not written down in Mowgli's records. In this respect, she explained, Dr. Yi's record-keeping did not comply with the Board's standards.

On May 10, 2007, the Board issued its adjudication. It held that Dr. Yi committed veterinary malpractice and violated the Board's record-keeping regulations. Specifically, the Board found in favor of the Bureau on three counts of alleged malpractice: failure to do a complete physical exam (Count II); failure to recommend or do repair surgery (Count III); and failure to repair Mowgli's fracture (Count IV). It also held that Dr. Yi's record-keeping on Mowgli did not meet the Board's regulations (Count VI). On the other hand, the Board found in favor of Dr. Yi on Count I (failure to offer or to take a radiograph) and Count V (failure to prescribe pain medication). Although the Bureau had recommended a two-year suspension to be served by probation under supervision of

---

**4.** This portion of Dr. Runnels' report was read into the record; the report itself was not     made part of the record.

another veterinarian, the Board revoked Dr. Yi's license.

■ The present appeal followed.[5] Dr. Yi raises two issues for this Court's review.

First, Dr. Yi contends that the Board's findings of malpractice are not supported by substantial evidence and, indeed, in many cases are contrary to the evidence of record. For example, the Board based some of its factual findings upon a treatise authority, which was never discussed or referenced at the hearing, let alone admitted into evidence. Further, the Board's findings of malpractice were directly contradicted by the Bureau's expert, who testified that if Masters refused an x-ray and surgery, then Dr. Yi did not commit malpractice. All Dr. Yi could do, he argues, was try to protect the leg from further damage. The Board's response is that the Bureau's expert was not "helpful" and that it is free to draw on the knowledge and expertise of its professional members to make its findings relevant to malpractice. Board Brief at 9.

Second, Dr. Yi contends that the Board abused its discretion in revoking his license where the only violation that was proven was poor record-keeping. Dr. Yi argues that a revocation for a record-keeping violation is completely inappropriate because his record-keeping practices were fully addressed by the Board two years after the Mowgli incident and one year prior to the enforcement action at issue in this appeal.

**ADMINISTRATIVE EXPERTISE**

As correctly observed by Dr. Yi, some of the Board's findings and discussion rely upon information and veterinary precepts that are nowhere in evidence. The Board acknowledges these lacunae in the record but contends that since "the Board includes members with expertise in veterinary medicine," the Board may draw the proper conclusions without expert testimony. Adjudication at 19; R.R. 185a. The Board misapprehends the extent to which it may put its administrative expertise to work. The Board may not substitute its judgment for the expert who did testify, and it may not rely on the knowledge of its Board members to augment the record evidence.

■ The United States Supreme Court is the source of the fundamentals of administrative practice and procedure, and one of the first precepts it established is that administrative officers acting in a quasi-judicial capacity may not "act on their own information, as could jurors in primitive days." *Interstate Commerce Commission v. Louisville & Nashville Railroad Co.*, 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431 (1913).[6] An agency that uses its specialized knowledge as a substitute for evidence will not have its order sustained. *Baltimore & Ohio Railroad Co. v. United States*, 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667 (1924). Simply, for an agency to rely on facts withheld from the record is a denial of due process. *Ohio Bell Telephone Co. v. Public Utilities Commission,*

5. The Court's review of the State Board of Veterinary Medicine's adjudication is whether the Board violated constitutional rights, committed an error of law, or whether all material findings of fact are supported by substantial evidence. *Nelson v. State Board of Veterinary Medicine*, 863 A.2d 129, 132 n. 4 (Pa.Cmwlth. 2004). An agency's determination will be set aside if the agency has abused its discretion, exceeded its authority or misapplied the law. *Id.*

6. To the contrary, parties "must be given full opportunity to cross examine witnesses, to inspect documents, and *to offer evidence in explanation or rebuttal.*" *Interstate Commerce Commission*, 227 U.S. at 93, 33 S.Ct. 185 (emphasis added).

301 U.S. 292, 302–03, 57 S.Ct. 724, 81 L.Ed. 1093 (1937) (explaining that due process requires that the party against whom evidence is presented must "see the evidence or hear it [or be able to] parry its effect ... and challenge the deductions made from them."). Information known personally to administrative officers must be disclosed and put on the record

> so that the supposed fact may be supplemented, explained, or refuted by contrary evidence, and so that a court, on judicial review, may be informed of what facts the agency has utilized, so as to determine the existence of evidence in support of the decision.

Public Utilities Commission v. Cole's Express Re: Motor Common Carrier Rate Increases and Decreases, 153 Me. 487, 138 A.2d 466, 498 (1958) (quoting 42 Am.Jur. Public Administrative Law § 130).[7]

■ This does not mean that an agency may not use its expertise to evaluate evidence. The use of such expertise, however, is limited to drawing inferences from the facts of record, as is done by all fact-finding tribunals, whether or not the tribunal brings expertise to bear upon the inference process. Radio Officers' Union, C.T.U. v. National Labor Relations Board, 347 U.S. 17, 49–50, 74 S.Ct. 323, 98 L.Ed. 455 (1954) (holding that an agency may draw on experience to draw reasonable inferences from the record). Administrative expertise is appropriately used to resolve conflicts in the evidence. In Travelers Indemnity Co. v. Insurance Department, 126 Pa.Cmwlth. 41, 558 A.2d 568, 571 (1989), for example, this Court explained that "it is within the Commissioner's province to draw ... inferences and interpret inconsistent or ambiguous data. The Commissioner's expertise in this area [of rate making] is to be given considera-

ble deference." While an agency may use its administrative expertise to evaluate evidence, it may not use its specialized knowledge as a substitute for evidence. The difference has been aptly explained by the Oregon Supreme Court as follows:

> It is one thing ... to say that an agency may employ its experience and expertise to evaluate and understand evidence and quite another to allow it to use its special knowledge as a substitute for evidence presented at a hearing. A fundamental premise of administrative law is that the quality and efficiency of the regulatory process will be enhanced by delegating authority to experienced, expert administrators. Just as fundamental, however, is the principle that fact-finding in contested cases is governed exclusively by the record of the hearing.

Drew v. Psychiatric Security Review Board, 322 Or. 491, 909 P.2d 1211, 1214 (1996) (quotation omitted) (emphasis added). The Court further explained that the substantial evidence rule

> loses its meaning if it is interpreted as leaving to the internal "expertise" of agency personnel, rather than to the external scrutiny of appellate courts, the critical question [of] whether the facts of the case permit the administrative choice involved.

Id. at 1215 (emphasis added).

These fundamental principles have been adopted by our Supreme Court with respect to Pennsylvania's administrative agencies. In Pennsylvania Labor Relations Board v. Sand's Restaurant Corp., 429 Pa. 479, 240 A.2d 801 (1968), our Supreme Court confirmed the principle that the Labor Relations Board may draw on its expertise to resolve issues of fact. However, it also clarified that inferences

7. An agency "may not use its special knowledge as a substitute for evidence presented at a hearing." 2 Am.Jur. 2d Administrative Law § 349.

must, in every case, be drawn "from the established facts" in order to satisfy the substantial evidence test. *Id.* at 485, 240 A.2d at 804.[8]

Nevertheless, the Board believes that drawing on information known to the professional members of a licensing board, without placing this information in the record, has been sanctioned by this Court, pointing to *Kundrat v. State Dental Council and Examining Board,* 67 Pa.Cmwlth. 341, 447 A.2d 355 (1982). In that case a dentist installed a ten-tooth bridge in a patient's mouth by affixing it to three remaining anterior teeth; the bridge failed. The Dental Board found, without the benefit of expert testimony about the standard of care for fashioning a bridge, that the respondent had committed dental malpractice. This Court held that expert testimony was not necessary in this circumstance, holding that the dentists on the board could "draw on their expertise" to reach this conclusion. *Id.* at 358.

*Kundrat* is best explained as a gross malpractice case. At common law, where malpractice is obvious, a jury does not need to hear expert testimony on the requisite standard of care in order to find that the defendant has committed malpractice. *Hightower–Warren v. Silk,* 548 Pa. 459, 463 n. 1, 698 A.2d 52, 54 n. 1 (1997) (noting that expert testimony is not required where the act of medical malpractice is so obvious that it can be understood by nonprofessional persons). In the case of *Kundrat,* even a layman can appreciate that, mechanically, three teeth cannot support ten others. It is nearly a case of *res ipsa loquitur.*

Further, *Kundrat* has been subsequently explained as an inference case, not a case that authorizes a licensing board to draw on the knowledge of its professional members to make findings of fact. In *Batoff v. State Board of Psychology,* 718 A.2d 364, 367 (Pa.Cmwlth.1998), this Court held that the State Board of Psychology could *not* substitute "its opinion for that of the expert witnesses who testified." By rejecting all expert testimony offered, the board was left with no remaining evidence to support its findings. Accordingly, we reversed the Board's adjudication. Although the Supreme Court then reversed this Court, it agreed with the principle that an adjudicator may *not* substitute its judgment for that of an expert witness. The Supreme Court simply concluded that the principle had not been violated by the State Board of Psychology. Notably, the Court emphasized the obligation to begin with the facts of record:

> [T]here is every indication that the Psychology *Board merely filtered the existing expert testimony and ample documentary evidence* through the lens of its own collective expertise, which, under the circumstances, was the expected, proper, and fair way to proceed.

*Batoff v. State Board of Psychology,* 561 Pa. 419, 428, 750 A.2d 835, 840. In short, drawing on expertise is appropriate when used to "filter" "existing expert testimony and ample documentary evidence." *Id.*

That an agency may use its expertise to "filter" evidence does not mean, however,

8. Stated otherwise, circumstantial evidence can constitute substantial evidence. This Court has stated:
> In order for the party with the burden of proof to prevail when relying on circumstantial evidence, the evidence must be adequate to establish the conclusion sought and must so preponderate in favor of that

> conclusion as to outweigh in the mind of the factfinder any other evidence and reasonable inferences ... which are inconsistent.

*Shrader v. Bureau of Professional & Occupational Affairs,* 673 A.2d 1, 2 (Pa.Cmwlth.1995) (internal quotation omitted).

that it may use its expertise as a substitute for evidence. The difference is illustrated in *Pennsylvania Labor Relations Board v. Kaufmann Department Stores*, 345 Pa. 398, 29 A.2d 90 (1942), where the factual question presented was whether an employee had been dismissed for union activity or for poor sales performance. The employee's sales during the three-month period prior to furlough were the lowest in the department. Believing that Kaufmann's would have looked at this employee's sales over his entire tenure had its motives been pure, the board decided that the employee was dismissed for his union activity not his poor sales. The Supreme Court concluded that the Labor Relations Board's beliefs were based upon its own judgment, not the evidence. *Id.* at 404, 29 A.2d at 94. Accordingly, the Supreme Court reversed the Labor Relations Board for making factual findings of discrimination not supported by substantial evidence.[9]

■■ In sum, an agency's administrative expertise does not relieve it of the obligation to make factual findings "supported by the substantial and legally credible evidence." *Sand's Restaurant Corporation*, 429 Pa. at 486, 240 A.2d at 805. Administrative expertise can be used to resolve conflicts in the testimony and to draw reasonable inferences from the facts of record. *Travelers Indemnity Co.*, 558 A.2d at 571. However, an agency cannot use the specialized knowledge of its administrators as a substitute for evidence. *Baltimore & Ohio Railroad*, 264 U.S. at 263, 44 S.Ct. 317. Neither *Kundrat* nor *Batoff* gives a green light to an agency's use of information known to the adjudicator as a basis for fact-finding. To do so would deprive a respondent, such as Dr. Yi, of the opportunity to examine the evidence and "parry [its] effect" with rebuttal evidence to show why the agency's information is either wrong or not relevant. *Ohio Bell*, 301 U.S. at 302, 57 S.Ct. 724. Further, it denies appellate courts the ability to determine whether an agency's factual findings are supported by substantial evidence. *Drew*, 909 P.2d at 1215.

With these principles in mind, we consider each count of malpractice and whether the Board's findings of fact and conclusions of law can be sustained.

## COUNT II: FAILURE TO EXAMINE

■ With respect to Count II, the Board found that Dr. Yi did not do a complete physical exam of Mowgli. For the most part, the Board accepted Dr. Yi's testimony as true, and his testimony served as the basis for many of the Board's findings of fact. However, the Board did not credit Dr. Yi's statement that he did a complete physical exam of Mowgli, explaining that it found the substance of Dr. Yi's testimony on this issue not to be reliable.[10] According to the Board, what Dr. Yi stated was inconsistent

9. By comparison, in *Sand's Restaurant Corporation*, 429 Pa. at 486–87, 240 A.2d at 805, the evidence established that the employer harbored an anti-union *animus;* the employer had a history of discharging employees who became involved in union activities; and the employer could not offer a reason for dismissing these employees. The Supreme Court held that the board could reasonably infer from this body of evidence that employees had been dismissed, improperly, for their union activities.

10. Specifically, the Board concluded that Dr. Yi did not do a complete physical examination of Mowgli for the following reasons: a physical examination was not recorded in Mowgli's records; Dr. Yi stated that his practice was to record only abnormal findings but it is inconceivable that there were no abnormal findings given Mowgli's condition; and Dr. Yi's estimate of Mowgli's weight was too high.

with information known to professional Board members about a Pomeranian dog, particularly one in distress. However, this information on which the Board relied lacks any foundation in the record.

At the hearing, Dr. Yi estimated Mowgli's weight to be approximately 20 pounds. The Board found, as fact, that a Pomeranian weighs between three and seven pounds. Adjudication, Finding of Fact No. 7; R.R. 170a. Dr. Yi stated that he did not record the results of Mowgli's general physical exam because at the time he was recording only abnormal findings, which in Mowgli's case was his fractured hind leg. The Board found, as fact, that a dog in Mowgli's condition would have severe pain. Adjudication, Finding of Fact No. 58; R.R. 176a. Pain would cause "abnormal" vital signs but none were recorded by Dr. Yi.[11] These "inconsistencies" led the Board to find Dr. Yi's testimony that he did a general exam not credible.[12]

The record does not support the Board's findings of "inconsistencies."[13] To support its factual finding that a Pomeranian weighs three to seven pounds, the Board cited to the internet. Adjudication, Finding of Fact No. 7; R.R. 170a. To support its factual finding that a broken leg causes severe pain, the Board cited to a publication by Teton New Media Press entitled "Pain Management for the Small Animal Practitioner." Adjudication, Finding of Fact No. 58; R.R. 176a. From there, the Board recites, without any support in the record, or even an extra-record treatise or internet authority, that "it is inconceivable" that severe pain would not have affected Mowgli's vital signs. Adjudication at 16; R.R. 182a. The Board's analysis cannot be sustained.

■ The Board cannot use the internet or a treatise on small animal pain management to make findings of fact. First, this information was not offered into evidence by either party. Extra record evidence cannot sustain an adjudication. *Ohio Bell,* 301 U.S. at 302–303, 57 S.Ct. 724. Second, learned treatises are hearsay, for which there is no exception under Pennsylvania law, and they may not be admitted into evidence. *Majdic v. Cincinnati Machine Co.,* 370 Pa.Super. 611, 537 A.2d 334, 340 (1988).[14] Third, there is no evidence in the record that severe pain would cause abnormal vital signs; on this point the Board simply offers its judgment as a substitute

---

11. The Board construed Dr. Yi's use of "abnormal" narrowly, *i.e.,* that he would record an abnormal temperature had he taken it. Dr. Yi did record Mowgli's major abnormal findings, *i.e.,* the compound fractures of his left leg. Dr. Yi was never given the opportunity to explain what he meant by "abnormal findings." Dr. Yi's statement about Mowgli's weight was an estimate, based upon his recollection of an event that took place several years ago. He may have simply misspoke. The Board, however, treats this statement on a minor point as evidence of Dr. Yi's intent to deceive the Board.

12. The Board did not make its credibility assessment on the basis of witness demeanor. Rather, it did so for objective reasons. *See, e.g., Daniels v. Workers' Compensation Appeal Board (Tristate Transport),* 574 Pa. 61, 78, 828 A.2d 1043, 1053 (2003). Here, the Board's objective reasons are based on extra-record facts and assumptions.

13. Indeed, the Board's factual finding that Mowgli's maximum weight was seven pounds was contradicted by the record evidence from Wissahickon, which recorded Mowgli's weight at 10.25 pounds. Of course, there is no way of knowing that the scale at Wissahickon was accurate or that Mowgli's weight was correctly recorded.

14. Treatises may be used in examination and cross-examination of experts to explain the basis of an opinion. *Aldridge v. Edmunds,* 561 Pa. 323, 334, 750 A.2d 292, 298 (2000).

for evidence.[15] In acting on its own information, as did "jurors in primitive days," the Board violated the substantial evidence rule. *Louisville & Nashville Railway*, 227 U.S. at 93, 33 S.Ct. 185; *Kaufmann*, 345 Pa. at 404–06, 29 A.2d at 94–95, 29 A.2d 90.

Further, Dr. Runnels, the Bureau's expert, stated there was no reason not to believe Dr. Yi's testimony. She did not note any inherent flaws in the substance of his testimony regarding his examination of Mowgli, as did the Board. The Board dismissed Dr. Runnels' testimony as "not helpful," and it ignored the circumstantial evidence that would support a finding that Dr. Yi did a general exam. As noted by Dr. Yi, Mowgli was one of only four patients seen on July 31, 2003, and was held overnight, thereby giving Dr. Yi ample opportunity to do a general physical exam. In addition, Mowgli survived anesthesia, suggesting that his vital signs were taken. In short, the evidence, such as it is, does not support the Board's decision not to credit Dr. Yi's testimony on its substance.[16]

However, even if we were to affirm the Board's decision not to credit Dr. Yi, the evidence is inadequate to support the Board's finding that Dr. Yi did not do a physical exam. The Bureau had the burden of proving a negative, *i.e.*, that Dr. Yi did not do a physical exam. The Bureau did not make its case.[17]

As has often been explained, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, [but must be] ... more than a scintilla and must do more than create a suspicion of the existence of the fact to be established." *Lewis v. Civil Service Commission of Philadelphia*, 518 Pa. 170, 175, 542 A.2d 519, 522 (1988) (citations omitted). Without substantial evidence, "our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators." *Kaufmann*, 345 Pa. at 400, 29 A.2d at 92 (quoting *Consolidated Edison Co. of New York v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

Our Supreme Court has specifically considered the question of whether negative evidence can support a positive factual finding. In *Pennsylvania State Board of Medical Education & Licensure v. Schireson*, 360 Pa. 129, 61 A.2d 343 (1948), the state licensing board sought to revoke the license of a physician on the theory that he had lied in his license application by stating that he attended the University of Maryland in the 1902–1903 academic year. In support, the board produced negative evidence in the form of "incomplete records," *i.e.*, the physician's matriculation cards at the University of Maryland that were not filled out in every block. The Court held that such "negative evidence"

---

**15.** Information, such as a Pomeranian's normal weight, may be the type of fact that can be established by official notice. However, official notice cannot be taken without giving the other party the opportunity to dispute the fact. *See* note 22, *infra*.

**16.** The Board's conclusion on Count II is also inconsistent with its holding on Count VI that Dr. Yi's medical records on Mowgli did not comply with the Board's regulations. The Board cannot have it both ways. If the medical records were inadequate because they do

not record the outcome of Mowgli's general exam, then the inference must be that Dr. Yi did examine Mowgli.

**17.** The Bureau could have produced other patient records, or called as witnesses other patient owners or employees, to make its case that Dr. Yi did not do complete physical examinations as a matter of routine. The Bureau could also have called or subpoenaed Masters to testify regarding Dr. Yi's physical examination, or lack thereof, of Mowgli.

was weak, inconclusive, and did not constitute substantial evidence.

In the case *sub judice,* it was the Board's prerogative to reject all witness testimony, but it was then left without any positive evidence. The remaining "evidence" consists solely of a negative inference from a statement not found credible. This is ephemeral, not substantial, evidence, which, at best, supports a suspicion. *Lewis,* 518 Pa. at 175, 542 A.2d at 522. Indeed, even the Board acknowledged that in the absence of "any positive evidence," it could not find that Dr. Yi did not offer to do an x-ray. Adjudication at 15, R.R. 181a. For reasons unknown, the Board did not follow this prescription with respect to its other critical findings of fact.

The Board's decision not to believe Dr. Yi's unequivocal statement that he did a complete physical examination of Mowgli is not, in itself, substantial evidence that Dr. Yi did not do the exam. Because the Board's finding is not supported by substantial evidence but, at best, the proverbial scintilla of evidence, the Board's adjudication on Count II cannot be sustained.

## COUNT III—FAILURE TO OFFER OR PERFORM REPAIR BY SURGERY

■ With respect to Count III, the Board's factual findings and analysis are even weaker. The Board found that Dr. Yi did not offer repair surgery or perform repair surgery. The point that Mowgli's leg was not repaired by surgery was never in contest. All agreed that a compound fracture cannot be repaired except by internal fixation applied surgically and that it was not done in Mowgli's case because Masters refused permission. The only

question was whether repair surgery was offered or discussed with Masters.

The Board's conclusion on Count III is completely inconsistent with its conclusion on Count I, *i.e.,* failure to offer a radiograph. The Board found, as fact, that Masters "did not give [Dr. Yi] permission ... to take a radiograph." Adjudication, Finding of Fact No. 17; R.R. 171a. Without this permission, Dr. Yi could not take the next step of offering, or performing, a definitive course of surgery. Dr. Yi stated: "I suggest to her several times take x-ray before we do any surgery, amputation, whatever." N.T. 15; R.R. 29a.[18] Dr. Runnels confirmed that if Masters refused an x-ray, then Dr. Yi was severely limited in his ability to treat Mowgli and that splinting the leg until a decision was made was not inappropriate. Indeed, Dr. Runnels went further, opining that if Masters refused to give permission to do an x-ray, then Dr. Yi did not commit malpractice. The Board is not free to substitute its judgment for that of Dr. Runnels. *Batoff,* 718 A.2d at 367.

Without the permission of Mowgli's owner to do an x-ray, Dr. Yi could neither offer nor perform internal fixation surgery. Once the Board found in favor of Dr. Yi on Count I, it was constrained to find in favor of Dr. Yi on Count III. Its holding to the contrary must be reversed.

## COUNT IV: FAILURE TO REPAIR PROPERLY

■ This leaves Count IV, in which the Bureau asserted malpractice by reason of Dr. Yi's failure to repair Mowgli's leg properly. The Order to Show Cause alleged that Dr. Yi did not repair Mowgli's

18. The Bureau's counsel tried to get Dr. Yi to admit he did not own an x-ray machine. However, at the hearing, Dr. Yi explained that he has had an x-ray machine in his office since 1980 and routinely did x-rays on patient animals. He also testified that he had experience in treating compound fractures by internal fixation surgery.

leg by surgery and did not refer Mowgli to a veterinarian capable of doing reduction surgery. Order to Show Cause, ¶¶ 12, 14; R.R. 3a. These factual allegations were the sole basis of Count IV: failure to repair the leg properly. Order to Show Cause, ¶ 27; R.R. 4a–5a.[19] Nowhere did the Bureau allege that Dr. Yi's splinting was itself improperly done, yet that became the basis of the Board's adjudication on Count IV. Not only did the Board inappropriately pursue a different theory in its adjudication than was averred by the Bureau in its pleading, it based its findings on evidence not of record.

The Order to Show Cause expressed the Bureau's theory that Dr. Yi had undertaken to set Mowgli's broken leg by splint because he was not capable of doing a surgical repair. It pursued this theory in its examination of Dr. Yi, but the theory was quickly deflated by the evidence.

At the hearing, Dr. Yi explained that the splint was not intended to heal the compound fracture. It was intended to give Masters time to make a decision on how to treat Mowgli. Indeed, the Board accepted Dr. Yi's testimony that he did not set the broken bones or apply the splint in an effort to repair the fractures. Adjudication at 18; R.R. 184a. Dr. Runnels stated

that she would have done the splinting differently, in some respects,[20] but she did not state that Dr. Yi's method of splinting or treatment did not meet the standards of acceptable and prevailing veterinary medical practice.

Neither the Bureau's Order to Show Cause nor its evidence challenged the manner of Dr. Yi's splinting of Mowgli's leg.[21] It challenged only the purpose of the splint as an "improper repair" that should have been done by surgery. To the end, the Bureau asserted that it was malpractice for Dr. Yi not to refer Masters to another veterinarian. Nevertheless, in its adjudication, the Board turned the proceeding into a question of whether Dr. Yi's splinting procedures satisfied prevailing veterinary standards. It found that they did not.

In reaching that conclusion, the Board found that Dr. Yi should not have administered phenylbutazone to Mowgli. According to the Board, such medication is appropriate for horses and should be administered intravenously, not by injection. It also found that Dr. Yi did not remove enough necrotic tissue and that all such tissue needs to be removed down to the healthy tissue. It found that Dr. Yi should have administered systemic, not

---

19. The Order to Show Cause did not allege that the procedures used by Dr. Yi to splint Mowgli's leg were inadequate, and it did not contain a legal count entitled "incompetent splinting of broken leg."

20. For example, Dr. Runnels testified that, although painful when injected intramuscularly, phenylbutazone is an appropriate analgesic. She also would have instructed the owner to return in 48 hours, not one week. On cross, however, Dr. Runnels acknowledged that Dr. Yi's printed directions advised Masters to return if any problems developed with the splint or if Mowgli's condition worsened. She also acknowledged that if Masters had returned by August 9, 2003, Dr. Yi might have been able to save the leg.

21. The Order to Show Cause contained very specific allegations about Dr. Yi's treatment that the Bureau believed demonstrated malpractice: failure to do an x-ray, failure to do a complete physical examination and failure to prescribe any pain medications. The Bureau did not allege that Dr. Yi prescribed the *wrong* pain medication; that Dr. Yi did not remove enough necrotic tissue; or that he did not prescribe or administer systemic antibiotics. These unstated allegations, however, became the focus of the Board's adjudication. This is a problem because Dr. Yi had no notice that he had to explain or address these additional, and unpled, aspects of his care of Mowgli.

topical, antibiotics. Finally, it found that Dr. Yi should have scheduled the next appointment three days later, not one week later. In each instance, the Board found that Dr. Yi's conduct did not meet prevailing veterinary medical standards. The Board's findings and conclusions cannot be sustained.

Some of the Board's findings lack any record basis whatsoever. The record is silent on whether phenylbutazone is designed for horses and must be administered intravenously. The Board cites to the Veterinary Physician's Desk Reference for this proposition, but this treatise was never discussed at the hearing and is inadmissible hearsay. *Majdic*, 537 A.2d at 340. The Veterinary Physician's Desk Reference, which may or may not be a reliable source of information, cannot be used to find facts. With respect to how much necrotic tissue must be removed, the Board does not even cite to an extra-record source. It simply opines, out of whole cloth, that "acceptable and prevailing veterinary medical practice requires a veterinarian to debride necrotic tissue sufficiently to reveal healthy tissue." Adjudication at 20; R.R. 186a.[22]

22. An agency may not have its decision supported by judicial notice, or "official notice," of facts not in evidence. In *Ohio Bell*, the U.S. Supreme Court explained the limits of judicial, or official, notice:

> Courts take judicial notice of matters of common knowledge. They take judicial notice that there has been a depression, and that a decline of market values is one of its concomitants. How great the decline has been for this industry or that, for one material or another, in this year or the next, can be known only to the experts, who may even differ among themselves. For illustration, a court takes judicial notice of the fact that Confederate money depreciated in value during the war between the states, but not of the extent of the depreciation at a given time and place. The distinction is the more important in cases where as here the extent of the fluctuations is not collaterally involved but is the very point in issue. *Moreover, notice, even when taken, has no other effect than to relieve one of the parties to a controversy of the burden of resorting to the usual forms of evidence. It does not mean that the opponent is prevented from disputing the matter by evidence* if he believes it disputable.

*Ohio Bell*, 301 U.S. 292, 301–02, 57 S.Ct. 724, 81 L.Ed. 1093 (citations and quotations omitted) (emphasis added). The highlighted principles are embodied in Pennsylvania administrative law. For example, in *West Penn Power Co. v. Pennsylvania Public Utility Commission*, 50 Pa.Cmwlth. 164, 412 A.2d 903 (1980), the PUC sought to take official notice of its previous order allowing the same utility, West Penn Power Co., to discontinue operating one of its generating units. This Court approved such official notice with the following admonition:

> Before an administrative agency in an adjudication can base its findings on information contained in the records of other cases decided by itself, it must appear on the record that notice was given to the parties *of record that the adjudicating body is considering* specified information.... Only in this way can a party's fundamental due process rights of notice and an opportunity to be heard be protected.

*Id.* at 906 (quoting *City of Erie v. Pennsylvania Public Utility Commission*, 41 Pa.Cmwlth. 194, 398 A.2d 1084, 1086 (1979)). Thus, even if an agency is taking official notice of something as indisputable as a record of a case decided by the agency itself, notice must be given to the parties.

We recognize that the General Rules of Administrative Practice and Procedure allow a presiding officer to take official notice of "any matters as to which the agency by reason of its functions is an expert." 1 Pa.Code § 35.173. However, the Rules also guarantee that "[a]ny participant shall, on timely request, be afforded an opportunity to show the contrary." *Id.* In other words, as the U.S. Supreme Court explained in *Ohio Bell*, the doctrine of official notice does not trump the due process rights of a participant in an administrative hearing to be given notice that some facts will be made of record by the device of official notice.

In sum, the Board cannot establish the proper way to administer pain relievers or to

Other findings, such as the need to administer systemic antibiotics or to schedule an earlier follow-up appointment, are consistent with Dr. Runnels' testimony on how she would have treated Mowgli. However, Dr. Runnels never opined that not following her preference constituted malpractice. Professionals exercise judgment in a variety of ways, and it does not follow that a difference in opinion indicates malpractice by one or the other professional. Indeed, had he been given the opportunity to respond to these observations of the Board, Dr. Yi might have offered an explanation.[23] Dr. Runnels did not testify that Dr. Yi applied the splint in an incompetent or negligent manner. To the contrary, she testified that if Masters refused an x-ray or surgery, Dr. Yi did not commit malpractice.

The findings of fact critical to Count IV are not supported by substantial evidence. Some findings are based upon the knowledge of Board members, which cannot sustain a finding for all the reasons set forth above. On the standard of care, the Board has simply substituted its judgment for that of Dr. Runnels, which it cannot do. Finally, the Board's conclusion on Count IV is at odds with the Board's finding that Dr. Yi never intended the splint to serve as a repair. The Board transformed the "failure to repair" count into a "failure to do a proper splinting." Because the Order to Show Cause did not put Dr. Yi on notice that his manner of splinting Mowgli's leg

was an issue, the Board was not free to enlarge the scope of the hearing in this way. For these reasons, the Board's holding on Count IV cannot be sustained.

## COUNT VI: INADEQUATE RECORD-KEEPING

■■■ Dr. Yi conceded that the medical records for Mowgli did not conform to the Board's regulations; this factual finding is supported by the substantial evidence. We affirm the Board in this respect. However, this leads to Dr. Yi's argument that the Board's revocation of his veterinarian license was an abuse of discretion. Because we agree that the Bureau did not prove malpractice, the only question is whether Dr. Yi's inadequate record-keeping warrants a license revocation.[24]

■■ The Pennsylvania Supreme Court has explained an abuse of discretion as follows:

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.... We emphasize that an abuse of discretion may not be found merely because the appellate

---

debride necrotic tissues through the device of official notice. More importantly, official notice must be taken on the record. Experts may disagree. By not having the Bureau prove these facts, by evidence or by official notice, Dr. Yi was "prevented from disputing the matter by evidence if he believes it disputable." *Ohio Bell,* 301 U.S. at 302, 57 S.Ct. 724.

**23.** Systemic antibiotics might have been contraindicated for Mowgli. Because Dr. Yi had no notice that this was an issue in the pro-

ceeding, he did not have the opportunity to respond to this contention of the Board.

**24.** The Board may revoke a license for
(11) Incompetence, gross negligence or other malpractice, or the departure from, or failure to conform to, the standards of acceptable and prevailing veterinary medical practice, in which case actual injury need not be established.
Section 21(11) of the Veterinary Medicine Practice Act, Act of December 27, 1974, P.L. 995, *as amended,* 63 P.S. § 485.21(11).

court might have reached a different conclusion.

*Paden v. Baker Concrete Construction, Inc.,* 540 Pa. 409, 412, 658 A.2d 341, 343 (1995). An abuse of discretion is different from an error of law. An error of law occurs where, for example, an agency imposes a sanction that is not expressly authorized by statute. *Aetna Casualty and Surety Company v. Insurance Department,* 536 Pa. 105, 118, 638 A.2d 194, 200 (1994) (reiterating the principle that agencies can exercise only those powers expressly conferred upon it by the legislature). On the other hand, where a statute provides a choice of penalties for different violations, the agency's choice may be challenged under the abuse of discretion theory. It may be "manifestly unreasonable" for an agency to choose the most severe penalty to punish a single and relatively minor violation. However, the penalty chosen will be reviewed under the deferential standard required for abuse of discretion, and the court may not substitute its judgment for that of the agency. *Paden,* 540 Pa. at 412, 658 A.2d at 343.

Here, the Board revoked Dr. Yi's license pursuant to Section 21(1) of the Veterinary Medicine Practice Act, Act of December 27, 1974, P.L. 995, *as amended,* 63 P.S. § 485.21(1). Section 21(1) permits the Board to impose sanctions in disciplinary proceedings and provides, in pertinent part, as follows:

> The board shall suspend or revoke any license or certificate or otherwise discipline an applicant, licensee or certificate holder who is found guilty by the board or by a court of one or more of the following:
>
> (1) Wilful or repeated violations of any provisions of this act or any of the rules and regulations of the board.

63 P.S. § 485.21(1). Thus, the Board may suspend or revoke a license for willful or repeated violations of any rule or regulation of the Board, which here consists of Dr. Yi's failure to follow the Board's record-keeping regulation.

As a result of a case previously settled in 2005, Dr. Yi enrolled in remedial courses of study and submitted his records to the Board for its review and approval. Dr. Yi has not been charged with entering and maintaining patient records subsequent to 2005 that do not satisfy the Board's regulations. Dr. Yi's inadequate patient record for Mowgli in 2003 is not a repeat violation because it preceded the 2005 infraction. Further, there is no evidence that it was willful.

Revoking Dr. Yi's license on the basis of Mowgli's medical records cannot be justified by Section 21(1) of the Veterinary Medicine Practice Act. Further, it does not survive an abuse of discretion review. Dr. Yi's record-keeping practices resolved in 2005, after Mowgli was seen by Dr. Yi. To allow the Board to go back in time to justify a license revocation is manifestly unreasonable.

## CONCLUSION

The substantial evidence rule was developed to ensure a fair administrative hearing. The rule enables a respondent to prepare a defense to an agency's enforcement action, and it allows both parties meaningful judicial review. As our Supreme Court has explained, the rule of substantial evidence marks "the dividing line between law and arbitrary power." *Kaufmann,* 345 Pa. at 400, 29 A.2d at 92 (citations and quotations omitted).

For all the above-stated reasons, we reverse the Board.

## ORDER

AND NOW, this 19th day of November, 2008, the order of the State Board of Vet-

880 ■

erinary Medicine, dated May 10, 2007, in the above-captioned matter is hereby REVERSED.