# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lawrence Charles Bennett, D.C., :
            Petitioner :
                                    :
                                    :
        v.                          :   No. 412 C.D. 2018
                                    :   Argued: April 9, 2019
Bureau of Professional and          :
Occupational Affairs, State Board   :
of Chiropractic,                    :
            Respondent :

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**                    **FILED: May 8, 2019**

Lawrence Charles Bennett, D.C., (Licensee) petitions for review from an order of the State Board of Chiropractic (Board) suspending his chiropractic license based on violations of the Chiropractic Practice Act (Act).[1]  The Board determined Licensee engaged in misleading advertising regarding treatment possibilities using a non-Board approved device, and that his reliance on the device to diagnose and treat patients constituted unprofessional conduct.  Licensee contends the Board lacked authority to discipline his use of the device and representations regarding its efficacy because such activities related to nutritional counseling for which no chiropractic license is required.  In addition, he challenged certain findings that relied on expert testimony as not supported by substantial evidence, asserting the expert lacked competence to testify about the device.  Discerning no error below, we affirm.

---

[1] Act of December 16, 1986, P.L. 1646, as amended, 63 P.S. §§625.101-625.1106.

## I. Background

Licensee obtained his chiropractic license in June 1992. He received no complaints prior to the one underlying this licensure action. His chiropractic practice, located in Ephrata, Pennsylvania, includes use of alternative techniques. One such technique is galvanic skin measurement using Asyra, a Class II device registered with the United States Food and Drug Administration (FDA) (Device).

Relevant here, in 2012, Licensee placed a four-page advertisement in *The Plain Communities Business Exchange* in the form of a newsletter entitled "Improve Your Health for Life!" Reproduced Record (R.R.) at 325a-28a (Newsletter). After noting Licensee was a licensed chiropractor proficient in various techniques, the majority of the Newsletter lauded the benefits of using the Device. It represented that holding the two brass handles of the Device for a few minutes, while connected to a computer, tested for "over 7,000 issues present in the body." R.R. at 325a.

The Newsletter described the Device as integral to a "complete exam," more thorough than Licensee's basic exam. R.R. at 328a. For an additional $170, the complete exam included "computerized testing to determine[:] your overall state of health[;] ... the number of toxins being stored in your body[;] [and] which organs these toxins are being stored in." Id. The Newsletter explained: "As part of your comprehensive exam, the doctor will use the [Device] to evaluate your spine, hips and joints. If any of these areas are determined to be misaligned you will be receiving an adjustment to correct these findings." Id. (emphasis added). Under "Patient Cases," it stated "[c]omputerized testing allows me to treat every patient as a unique individual, never guessing about the cause of their illness." Id. (emphasis added).

2

The Newsletter also included "patient" testimonials. R.R. at 327a-28a. One testimonial, from a woman diagnosed with breast cancer, reported that use of the supplements indicated by the Device resulted in her cancer shrinking to half its initial size. The Newsletter represented Licensee had a "90% success rate" with the Device, noting it allowed him to treat patient illness generally. R.R. at 325a.

The content ended with "Dr. Bennett" in signature-style. R.R. at 328a. Then, below an ad for bus service between Ephrata and Ohio/Indiana, appeared a disclaimer. Printed in the same small font as most of the Newsletter, it read:

> The information presented in this newsletter is for informational purposes only. It is not intended to replace medical advice and/or care. You should not use the information contained herein for diagnosing or treating a health problem or disease or prescribing any medication. In addition, we do not prescribe medication nor do we recommend that you discontinue taking any prescription drugs.

Id.

In late 2012, a Missouri dentist registered a complaint with the Board about the Newsletter, asserting it was misleading. In particular, he was concerned that the Mennonite community was susceptible to believing its claims. The Board undertook an investigation, which lasted more than two years.

The Bureau of Professional and Occupational Affairs then issued a seven-count order to show cause. It alleged the following violations: committing immoral or unprofessional conduct (Count 1); departing from the standards of acceptable chiropractic care (Count 2); advertising chiropractic practice in a manner

3

intended or with a tendency to deceive the public (Count 3); making misleading, deceptive, untrue or fraudulent representations in the practice of chiropractic (Count 4); utilizing advertising that is false, fraudulent, deceptive or misleading (Count 5); holding himself out as a specialist without having a post-graduate certificate in that specialty (Count 6); and, making representations that chiropractic care would cure cancer or an infectious or communicable disease (Count 7). See R.R. at 2a-10a.

Licensee filed an answer in which he admitted to publishing the Newsletter. However, he denied the Newsletter contents violated the Act.

The Board held a formal hearing on the charges in October 2015. During the hearing, the Board presented the expert testimony of J. Clifford Renyo, D.C. (Expert), accepted by Licensee as an expert in chiropractic care. Licensee objected to Expert testifying regarding the capabilities of the Device. Licensee testified on his own behalf, and for the Commonwealth as on cross-examination.

Licensee admitted that the Newsletter represented he would "use the [Device] to evaluate your spine, hips and joints." Hr'g Tr., 10/1/15, Notes of Testimony (N.T.) at 24; R.R. at 75a. He explained the Device uses "resonances" to determine imbalances in the body, which did not necessarily affect functionality. N.T. at 26-28; R.R. at 77a-79a. He acknowledged the Board did not approve the use of the Device in chiropractic care. Licensee confirmed that patients referenced in the Newsletter were his patients, and that he used results from testing with the Device to treat his patients. N.T. at 56; R.R. at 107a. The majority of his patients receive the complete exam, which includes testing with the Device. N.T. at 65; R.R. at 116a.

4

In his case in chief, Licensee emphasized the disclaimer contained in the Newsletter and the additional disclaimer that he provided as part of the intake interview with all new patients. The disclaimer in the patient intake form stated:

> I understand that the procedures that [Licensee] uses in his practice are not a method for 'diagnosing' or 'treating' of any disease including conditions of cancer, AIDS, infections, or other medical conditions, and that these are not being tested for or treated. Furthermore, no promises or guarantees are made regarding the results of [Licensee's] procedures.

R.R. at 376a. Before undergoing treatment, each new patient signs and dates the intake form containing the above disclaimer. Licensee also underscored that counsel reviewed the Newsletter to assess its content.

Expert testified regarding the standard of care in chiropractic and whether the Device met those standards, and his view on representations in the Newsletter. He explained he researched the FDA's approval of the Device and documents the FDA published regarding the Device on its website. He opined the Device was not consistent with the chiropractic standard of care. He found the Newsletter misleading in that it indicated the Device could identify viruses for effective treatment when chiropractors are not licensed to treat communicable diseases. R.R. at 179a. Expert was concerned that Licensee "relie[d] on an unproven device to determine where misalignments, a.k.a. subluxations, are located before performing his adjustments. The ability to determine and correct a misalignment is fundamental to a chiropractor[']s training." Bd. Op., 2/28/18, Finding of Fact (F.F.) No. 26 (quoting N.T. at 125-26). He opined that before relying on a Device for use in chiropractic practice, a doctor must make sure that it is effective, particularly when it is not approved by the Board or accredited chiropractic institutions.

5

Ultimately, in February 2018, the Board issued its final adjudication, concluding Licensee was subject to discipline under the Act as set forth in Counts 1, 3, 4, 5, and 7 of the order to show cause. The Board considered the violations related to misrepresentations in the Newsletter (Counts 3, 4, and 5) as one violation. Specifically, it concluded that use of the Device, which is not Board-approved, without training on the Device, constituted "unprofessional conduct" that failed to conform to chiropractic standards in violation of Section 506(a)(11) of the Act, 63 P.S. §625.506(a)(11). As to the misleading advertising charges, the Board found the Newsletter indicated that the Device was meant to diagnose and treat a number of listed conditions that are outside the scope of chiropractic, like breast cancer. As a result, the Board suspended Licensee's license for 36 months, with an active suspension of three (3) months, effective 30 days later (March 30, 2018), followed by 33 months of probation. The Board also imposed a civil penalty of $10,000.

Licensee timely petitioned for review of the Board's final adjudication and order. Licensee also sought a stay pending appeal, which was unopposed. Thus, this Court granted a stay of the suspension.

## II. Discussion

On appeal,[2] Licensee argues the Board erred as a matter of law in regulating his nutritional counseling activities when that activity does not require a chiropractic license. He contends the Board's findings are not based on substantial evidence because there is no evidence that he used the Device as part of his

---

[2] In reviewing the Board's order, we consider whether constitutional rights were violated and whether the "order is supported by substantial evidence and is consistent with the law." Feingold v. State Bd. of Chiropractic, 568 A.2d 1365, 1366 (Pa. Cmwlth. 1990).

6

chiropractic care as opposed to nutritional counseling. He also contests Expert's qualifications as to use of the Device and its effectiveness, and challenges the Board's findings to the extent they relied on expert testimony.

There is no dispute that Licensee published the Newsletter, only whether the representations in the Newsletter fall within the practice of chiropractic under the Board's jurisdiction. Licensee maintains that he used the Device to perform nutritional counseling, for which a chiropractic license is not required.

## A. License in Chiropractic Care

"[T]he right to practice a chosen profession is subject to the lawful exercise of the power of the State to protect the public health, safety, welfare, and morals by promulgating laws and regulations that reasonably regulate occupations." Khan v. State Bd. of Auctioneer Exam'rs, 842 A.2d 936, 946 (Pa. 2004). A licensing board "'exercises considerable discretion in policing its licensees.'" Abruzzese v. Bureau of Prof'l & Occupational Affairs, State Bd. of Cosmetology, 185 A.3d 446, 453 (Pa. Cmwlth. 2018) (citation omitted). Accordingly, our review of disciplinary decisions by a professional board is extremely deferential. King v. Bureau of Prof'l & Occupational Affairs, State Bd. of Barber Exam'rs, 195 A.3d 315 (Pa. Cmwlth. 2018).

The Board has the power to decide matters related to chiropractic licenses, from issuance to revocation, and to regulate licensees pursuant to Section 302 of the Act, 63 P.S. §625.302. Attendant to this authority, the Board may suspend a license for "misleading, deceptive, untrue or fraudulent representations in the practice of chiropractic." Section 506(a)(2) of the Act, 63 P.S. §625.506(a)(2).

7

Here, Licensee maintains the Board exceeded its authority in regulating his representations regarding the Device because he uses it to perform nutritional counseling. Based on the premise that he uses the Device in nutritional counseling only, Licensee argues his representations in the Newsletter are beyond the Board's jurisdiction because no license is required to perform nutritional counseling.

Presuming for the sake of argument only that Licensee used the Device solely for nutritional counseling, we consider Licensee's contention that the Board lacks authority to impose any discipline for his activities as a nutritional counselor. He argues Conclusion of Law No. 3, that "the provision of nutritional counseling is one of the licensed activities within the definition of 'chiropractic' in the Chiropractic Practice Act," is erroneous. We disagree.

Section 102 of the Act defines "chiropractic" in full as follows:

A branch of the healing arts dealing with the relationship between the articulations of the vertebral column, as well as other articulations, and the neuro-musculo-skeletal system and role of these relationships in the restoration and maintenance of health. The term shall include systems of locating misaligned or displaced vertebrae of the human spine and other articulations; the examination preparatory to the adjustment or manipulation of such misaligned or displaced vertebrae and other articulations; the adjustment or manipulation of such misaligned or displaced vertebrae and other articulations; the furnishing of necessary patient care for the restoration and maintenance of health; and the use of board-approved scientific instruments of analysis, including X-ray. **The term shall also include** diagnosis, provided that such diagnosis is necessary to determine the nature and appropriateness of chiropractic treatment; the use of adjunctive procedures in treating misaligned or dislocated vertebrae or articulations and related conditions of the nervous system, provided that, after January 1, 1988, the licensee must be certified in accordance with this act to use adjunctive procedures; and **nutritional counseling**,

8

provided that nothing herein shall be construed to require licensure as a chiropractor in order to engage in nutritional counseling. The term shall not include the practice of obstetrics or gynecology, the reduction of fractures or major dislocations, or the use of drugs or surgery.

63 P.S. §625.102 (emphasis added). The Board is "bound by the statutory definition of chiropractic." Feingold v. State Bd. of Chiropractic, 568 A.2d 1365, 1367 (Pa. Cmwlth. 1990). By expressly including "nutritional counseling" within chiropractic, the legislature subjected such activities to the Board's regulatory authority when performed by a chiropractor. Id.

Licensee's proffered interpretation, to exclude nutritional counseling from chiropractic because a chiropractic license is not required to perform that activity, ignores the plain language in the Act. The phrase "nothing herein shall be construed to require licensure as a chiropractor in order to engage in nutritional counseling" simply means an individual engaged in nutritional counseling may not be prosecuted for practicing chiropractic without a license. Cf. Feingold (holding naturopath violated Act by engaging in unlicensed practice of chiropractic).

Nutritional counseling is expressly within the scope of chiropractic that is subject to Board regulation and discipline when that activity is performed by a licensed chiropractor. Thus, the Board did not exceed the scope of its authority in disciplining Licensee to the extent his activities related to nutritional counseling.

Regardless, the record does not support the factual predicate for Licensee's argument– that his use of the Device was limited to nutritional counseling. In reviewing the Newsletter, it contains no references to "nutritional counseling,"

9

although it contains a number of references to Licensee as "doctor," including at the top of the page as "Dr. Lawrence Bennett," and states he is a "licensed chiropractor." R.R. at 325a. Instead of nutritional counseling, the Newsletter refers to use of the Device as "computerized testing" and as part of the "comprehensive exam" or "complete exam" that Licensee performs on his chiropractic patients.

As described in the Newsletter and in his testimony, Licensee did not separate nutritional counseling from chiropractic care. Rather, the Device was a part of the regular care he provided to his patients. Licensee testified that the majority of his chiropractic patients purchased the complete exam. N.T. at 65; R.R. at 116a. Testing with the Device was Step 2 of a complete exam, after Step 1 (consultation), and prior to Step 3 (report of the doctor's findings), Step 4 (chiropractic adjustment), and Step 5 (muscle stimulation). Thus, Licensee used the Device on his patients on a regular basis in his chiropractic practice.

Based on the statutory definition of chiropractic, and as incorporated into Licensee's practice here, we conclude the Board's regulation of Licensee's nutritional counseling activities was within the Board's statutory authority.

**B. Insufficient Evidence**

Next, we consider Licensee's challenges to the Board's findings that he violated the Act as not supported by substantial evidence. He asserts Expert was not qualified to opine with respect to the Device or disclaimers, rendering his testimony incompetent and thus an insufficient basis for the Board's findings. He also contends the Board disregarded the evidence and import of his disclaimers.

10

An agency adjudication will be set aside if the agency's findings are not supported by substantial evidence. Feingold. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, [but must be] ... more than a scintilla and must do more than create a suspicion of the existence of the fact to be established." Yi v. State Bd. of Veterinary Med., 960 A.2d 864, 874 (Pa. Cmwlth. 2008) (citation omitted). "Pennsylvania courts have long recognized that administrative boards, comprised of members of the profession they oversee, may base their decisions on the collective expertise of those members." Batoff v. State Bd. of Psychology, 750 A.2d 835 (Pa. 2000). Further, "matters of credibility and evidentiary weight are within the exclusive discretion of the factfinder below, and are not within our scope of review." Hartman v. State Bd. of Optometrical Bd. of Exam'rs, 454 A.2d 1150, 1152 (Pa. Cmwlth. 1983).

The Board's regulations prohibit certain advertising, 49 Pa. Code §5.31, and "unprofessional and immoral conduct," 49 Pa. Code §5.81(1). Relevant here, "unprofessional conduct" includes: "(iii) Advertising a chiropractic practice in a manner which is intended or has the tendency to deceive the public[][3] … [and]

---

[3] Section 5.31(c) prohibits "false, fraudulent, deceptive or misleading" advertising as "unprofessional conduct." 49 Pa. Code §5.31(c). It provides, in pertinent part:

> (c) An advertisement shall be deemed by the Board to be fraudulent, false, deceptive or misleading if it does one of the following:
>
> (1) Contains a misrepresentation of facts.
> (2) Makes only a partial disclosure of relevant facts in its content or in the context in which it is presented ….
> (3) Creates false or unjustified expectations of beneficial treatment for a successful result.
> (4) Is designed to inflame or appeal primarily to a layperson's fears, ignorance or anxieties regarding the person's state of health or physical well-being.

Id. (emphasis added).

11

(xiv) Practicing or advertising adjunctive procedures without a certificate to use adjunctive procedures issued by the Board." 49 Pa. Code §5.81 (emphasis added).

Licensee disregards that nutritional counseling is part of chiropractic care, the subject for which he accepted Expert as qualified to offer an expert opinion. Expert testified the Device was not accepted as a treatment within chiropractic care. He also testified that use of the Device was not part of the curriculum in chiropractic schools, and programs did not offer certification in its use. N.T. at 126; R.R. at 177a. He noted his concern when a licensee holds himself out to the public as a chiropractor specializing in use of a particular device when the device is not Board-approved, and the licensee had no special training to use the device. N.T. at 122-27; R.R. at 173a-78a. Such is the case here.

Additionally, Expert's unfamiliarity with the Device did not render him unqualified to offer an expert opinion as to accepted levels of chiropractic care. Expert was qualified to opine that certain claims in the Newsletter amounted to misleading advertising by "creat[ing] false or unjustified expectations of beneficial treatment for a successful result." 49 Pa. Code §5.31; see N.T. at 128; R.R. at 179a.

Expert was also qualified to opine that chiropractic care does not treat cancer or infectious diseases; those conditions are not within chiropractic care. N.T. at 128; R.R. at 179a. Nevertheless, the Newsletter indicated patients suffering from such diseases received benefits from Licensee's treatment, as by shrinking the size of a cancer tumor. See R.R. at 327a. That evidence supports Count 7.

12

Moreover, the primary evidence the Board relied upon for its findings was the Newsletter and Licensee's admissions regarding his use of the Device.

Importantly, Licensee admitted he used the Device to test the majority of the patients who came to his chiropractic practice who received a complete exam. N.T. at 65; R.R. at 116a; see also Pet'r's Br. at 19. Licensee used the Device to assist him in treating his patients, including in assessing misalignments. R.R. at 77a. That Licensee did not rely *solely* on the Device to guide his treatment decisions does not change the fact that he used a non-approved device, for which he had no specialized training, in administering chiropractic care.

Licensee was responsible for the Newsletter content, including unsupported claims of a 90% success rate with his technique. N.T. at 83; R.R. at 134a. He confirmed the only training in his technique was his "chiropractic degree." N.T. at 82; R.R. at 133a. Licensee's use of the Device in his practice and his representations in advertising about its efficacy properly subject him to discipline by the Board.

As to Count 1, the Board established Licensee used the Device despite the lack of any specific training. Licensee acknowledged the Device was not approved by the Board or an accredited chiropractic institution. He also admitted the Device was a "scientific instrument" to analyze patients for which he received no special training. N.T. at 53; R.R. at 104a. Licensee's testimony, even without corroboration by Expert's testimony, adequately supports the Board's findings that Licensee committed unprofessional conduct by using a scientific device in his practice without specialized training.

13

Substantial evidence also supports the Board's findings that Licensee engaged in false or misleading advertising (Counts 3, 4 and 5). It bears emphasis that each page of the Newsletter referred to Licensee as "Dr. Bennett," and referred to his chiropractic patients, including several testimonials. In particular, it stated:

> The patient who frequents the chiropractic office week after week or month after month for the same recurring pain is most likely just treating the symptoms. Although the adjustment feels good for a while, this pain will continue to recur until you deal with the cause. […] The [Device] has allowed me to find the source of many pains that patients have otherwise been told to live with.

R.R. at 327a (emphasis added). Licensee also represented: "Computerized testing [with the Device] allows me to treat every patient … never guessing about the cause of their illness." R.R. at 328a. These representations suggest Licensee used the Device to discern causation of his patients' illnesses or sources of pain.

We reject Licensee's contentions that the Board disregarded evidence of the disclaimer. It made findings as to its content and its location in the Newsletter. See F.F. Nos. 16-17. In reviewing the Newsletter, the Board was permitted to consider the patient testimonials and misleading impressions from same as having more impact on the reader, creating overall false impressions that would not be allayed by the disclaimer. Licensee draws this Court's attention to no authority that inclusion of a disclaimer in an advertisement excuses foregoing misrepresentations.[4]

---

[4] In determining whether a reasonable person should have noticed a disclaimer in the commercial warranty context, courts consider the location of the disclaimer in a document, the size of its print and whether the disclaimer was differentiated, as by font style or color, from the remainder of the text. Borden, Inc. v. Advent Ink Co., 701 A.2d 255 (Pa. Super. 1997). Here, the disclaimer was located after an unrelated ad for bus service, in the same small print and without any special font differentiating it from the rest of the text so as to render it conspicuous. See Reproduced Record at 328a.

14

The Board had the professional expertise to consider the claims contained in the Newsletter, and whether they were misleading to a reader, and particularly the intended audience of chiropractic care or chronic pain patients. Batoff.  Because the record supports the Board's findings, and the findings support the Board's conclusions, we uphold the Board's disciplinary decision.  King.

### III. Conclusion

For the foregoing reasons, we affirm the Board's order.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lawrence Charles Bennett, D.C.,  :
           Petitioner  :
             :
           v.  :  No. 412 C.D. 2018
             :
Bureau of Professional and  :
Occupational Affairs, State Board  :
of Chiropractic,  :
           Respondent  :

# **O R D E R**

AND NOW, this 8th day of May, 2019, the order of the State Board of Chiropractic is **AFFIRMED**.

_____
ROBERT SIMPSON, Judge