**Joseph F. STONER, M.D., Petitioner**

v.

**BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE BOARD OF MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 18, 2010.

Decided Nov. 22, 2010.

Julia E. Gabis, Conshohocken, for petitioner.

Steven R. Dade, Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Joseph F. Stoner, M.D., petitions for review of an adjudication of the State Board of Medicine (Board) revoking his license to practice medicine for unprofessional conduct. The Board held that Dr. Stoner's examinations of two female patients constituted sexual misconduct for the stated reason that these examinations deviated from accepted standards of medical care and were medically unnecessary. Because the record lacked expert testimony to support the Board's premise that the examinations departed from accepted standards of care, or were medically unnecessary, we reverse.

## Background.

In May of 2004, MKH, a 24–year old female, filed a complaint with the Board about her October 2003 physical examination by Dr. Stoner. MKH also initiated a tort action against Dr. Stoner. Some years later, on September 15, 2006, the Bureau of Occupational Affairs (Bureau) issued an order to show cause to Dr. Stoner, alleging that he had committed sexual misconduct by performing a medically unnecessary pelvic and breast examination of MKH.

In 2005, AMS, a 19–year old female, filed a complaint with the Board about Dr. Stoner and initiated a tort action against him. On October 13, 2006, the Bureau issued an order to show cause to Dr. Stoner, alleging that he committed sexual misconduct by touching AMS's genital area when it was not medically necessary.

Dr. Stoner answered both orders, denying that anything inappropriate had occurred in the course of his examination or treatment of either MKH or AMS. The two proceedings were consolidated for hearing, which was conducted in May of 2007.

The Bureau's first witness was Dr. Stoner, called to testify as on cross-examination. Dr. Stoner testified that he was a licensed M.D. and board certified in pain management and anatomic pathology. He works part time for Hector Pagan, M.D., at the Advanced Pain Management Center in Monaca, Pennsylvania. He also maintains his own practice in New Castle, Pennsylvania, which focuses on pain management but includes a primary care component.

Dr. Stoner met MKH for the first time in early September of 2003 at Dr. Pagan's office. MKH, who makes her living selling memberships in Sam's Club, was at Dr. Pagan's office for that purpose. MKH made an appointment to see Dr. Stoner at his New Castle office to sell him a Sam's Club membership.

In the course of her sales presentation on September 26, 2003, at Dr. Stoner's New Castle office, MKH asked Dr. Stoner about his medical practice. She related her history of eczema, rosacea, varicose

veins and "asked [Dr. Stoner] for help." [1] Notes of Testimony (N.T.) 5/9/07, at 30; Reproduced Record at 9a (R.R. ____). Dr. Stoner confirmed that he could help, and MKH scheduled an appointment for the following week. It was agreed that MKH would bring information to Dr. Stoner about an upgraded Sam's Club Plus membership when she returned for this medical appointment.

On October 3, 2003, MKH appeared for her appointment at Dr. Stoner's office and completed a lengthy medical questionnaire. Dr. Stoner stated that he did not have an assistant with him during MKH's examination, explaining that there was only one staff person in the office that day, his sister-in-law. She was busy with other patients but was in and out of the examination room during MKH's appointment. At one point, she accompanied MKH to the restroom. N.T. 5/09/07, at 39; R.R. 11a.

Dr. Stoner explained that he did a complete physical examination of MKH, including a breast and pelvic examination, because MKH had not had one for years. Further, she did not have a family or OB/GYN physician to address her complaint of premenstrual vaginal discharge. In addition, MKH had responded both "yes" and "no" to the question in the patient questionnaire regarding pregnancy. Because Dr. Stoner did not have a gynecological table or speculum in his office, he could not do a visual inspection of MKH's vagina, which inspection is necessary to detect some types of tumors. Dr. Stoner does not routinely perform pelvic examinations, but he stated that he had done approximately ten in the ten years prior to the hearing.

With respect to AMS, Dr. Stoner stated that he examined her for the first time in October of 2003 at Dr. Pagan's clinic at the request of AMS's mother, who was Dr. Stoner's patient. He stated that he performed a breast examination on AMS at her initial appointment because she told him she did not know how to do one and was studying nursing. Dr. Stoner treated AMS for pain management throughout October of 2003. Treatment resumed in August of 2004, after AMS suffered injuries in an automobile accident. Dr. Stoner treated AMS's pain with a series of injections that were administered to the lower buttocks. This treatment continued through February 2005. Dr. Stoner denied ever touching AMS's genital area.

The Bureau then presented the testimony of MKH. She testified that she tried to cancel her October 3, 2003, appointment with Dr. Stoner, suggesting to him that she fax the upgraded Sam's Club membership information. Dr. Stoner responded that he would prefer to see her at the office. MKH stated that she appeared at Dr. Stoner's New Castle office in the late afternoon, with Joe Decaria, a fellow sales associate, who remained in the reception area while MKH was taken to an examination room.

There, the receptionist gave MKH a patient history questionnaire to complete. MKH did not fully complete the 19–page questionnaire but, rather, signed incomplete forms. When Dr. Stoner appeared, she informed him that she could not pay for the examination, but he "said that was fine." N.T. 5/9/07, at 86; R.R. 23a.[2] Dr. Stoner took a medical history from MKH.

---

1. Dr. Stoner conceded that eczema and rosacea are usually treated by a dermatologist, but he also maintained that he was able to treat them. He routinely treats varicose veins.

2. MKH stated that she did not have health insurance but then referred to her $75 copayment. She executed insurance consent forms. Her testimony is not clear on this point, but it is not relevant.

When it was completed, he told her to change into a gown, leaving her underwear and socks on, and left the room. Once she was changed, Dr. Stoner returned to do the physical. Before checking her heart and lungs, Dr. Stoner unfastened her bra. He then told her to lie down on the examining table and performed a breast examination. MKH testified that Dr. Stoner's breast examination was different from any other she had previously experienced because it was performed while she was lying down and included her nipples. Dr. Stoner then instructed MKH on how to perform a breast self-examination, which she did.

Dr. Stoner began to palpate her abdomen, prompting MKH to ask to use the restroom; she was accompanied there by Dr. Stoner's assistant. When Claimant returned, the examination resumed. After gloving, Dr. Stoner did a pelvic examination, in the course of which he rubbed her clitoris. N.T. 5/9/07, at 91; R.R. 24a. In response to Dr. Stoner's questions about how "it felt," MKH stated that "it felt fine." N.T. 5/09/07, at 92; R.R. 24a. The pelvic examination took "[m]aybe one to two minutes," according to MKH. *Id.*

After the pelvic examination, Dr. Stoner checked her reflexes and then examined her back and legs. When he saw the varicose vein on her leg, he said, "Oh, yeah. We can get rid of that baby." N.T. 5/9/07, at 93; R.R. 25a. She further testified that Dr. Stoner sat in a chair to watch her while she performed the range-of-motion test, saying "Okay. Um-hum. Ooh. Aah." *Id.* at 94; R.R. 25a. MKH testified that she had never heard a professional talk that way before.

MKH left Dr. Stoner's office quickly, telling Dr. Stoner to have his receptionist bill her for the examination. Once in the car, she asked Decaria, "Are pain management doctors supposed to perform vaginal exams?" N.T. 5/9/07, at 96; R.R. 25a. She called her mother and then her sister, who advised her to go to the police. Decaria accompanied MKH to the New Castle Police Department where they were interviewed separately. MKH was examined at a nearby hospital.

On cross-examination, MKH admitted that she did not object to Dr. Stoner about either the breast or pelvic examination. She did not voice an objection to Dr. Stoner's assistant who accompanied her to the restroom. MKH conceded that Dr. Stoner did not make any sexual comments or gestures during either the breast or pelvic examination, although she interpreted his question about "how it felt" to have a sexual overtone. MKH did not observe any signs of sexual arousal on Dr. Stoner's part. MKH confirmed that the police did not follow up with her after she made her complaint and did not charge Dr. Stoner.

Next, the Bureau presented the testimony of Joseph Decaria, by telephone conference. Decaria confirmed that he accompanied MKH to Dr. Stoner's office and recalled MKH explaining that Dr. Stoner was going to look at her rosacea and other skin and vein problems. Decaria testified that the appointment took a long time and that MKH was upset when she returned to the waiting room. She told Decaria "that the doctor did an exam that she never expected and that he touched her in places that she never expected." N.T. 5/9/07, at 12; R.R. 209a. The two consulted MKH's sister, who worked for an attorney. MKH's sister suggested that they go to the police station, and they did so. Decaria conceded that his knowledge of what happened inside the examination room was based entirely on MKH's statements.

Finally, the Bureau presented the testimony of AMS. She testified that she consulted Dr. Stoner in October of 2003 for

headaches, at the suggestion of her mother, and was treated with pain injections. AMS stated that she returned to see Dr. Stoner in August 2004, after her automobile accident. According to AMS, Dr. Stoner performed a breast examination at the initial visit in October of 2003, even though she had informed him that she knew how to perform a breast self-examination. AMS testified that the breast examination was unusual because "it didn't seem as if he was applying pressure." N.T. 5/9/07, at 14a; R.R. 39a.

AMS then stated that on one occasion, which she could not identify by month or day, except to say it was a day between August 2004 and February 2005, Dr. Stoner touched her genital area while injecting her buttocks. AMS stated that Dr. Stoner was not wearing gloves at the time he touched her "vaginal area." N.T. 5/9/07, at 154; R.R. 40a. AMS did not report the touching to anyone in her family because her parents respected Dr. Stoner; she feared they would not believe her.

On cross-examination, AMS conceded that she continued to consult Dr. Stoner for treatment after this "touching" incident. She also conceded that Dr. Stoner never made any sexual comments or gestures but was quiet during the examination. AMS acknowledged that she told no one about the touching until one day her attorney, who was representing her with respect to her August 2004 automobile accident, asked if Dr. Stoner had ever touched her inappropriately. AMS's attorney was a member of the law firm representing MKH in her tort claim against Dr. Stoner. AMS testified that she disliked Dr. Stoner's questions about the bruises on her body and whether she was in an abusive relationship with her boyfriend.

In response to the Bureau's case, Dr. Stoner first presented character witnesses, who testified by telephone conference: Dr.

Karl Williams and Dr. Gloria Carter. Drs. Williams and Carter, who had each known Dr. Stoner professionally and personally in excess of 15 years, attested to his reputation in the medical community for excellence, both ethically and professionally. Dr. Williams employs Dr. Stoner to cover for his practice when on vacation, and Dr. Carter spoke, specifically, about Dr. Stoner's reputation for honesty. Both testified that Dr. Stoner enjoys a good reputation in the community at large.

Dr. Stoner then presented the testimony of Dr. Hector Pagan, who is board certified in pain management and anesthesiology. Dr. Pagan testified that he has employed Dr. Stoner at his Advanced Pain Management Center since 1997. Dr. Pagan explained that prior to 2003, medical assistants entered and left the examination room as needed. Since the incident with AMS, his office policy provides that medical assistants are present for the duration of all physical exams. Dr. Pagan explained that Dr. Stoner has a longstanding and particular interest in breast pathology because of the fellowship he completed with Dr. Bernard Fisher, a renowned breast cancer researcher from the University of Pittsburgh. He described Dr. Stoner as a "very thorough, competent physician, detail-oriented." *Id.* at 53; R.R. 220a.

On cross-examination, Dr. Pagan testified that he does not do breast or pelvic examinations as part of his regular physical examination unless the patient has a specific complaint. He stated that before he does a pelvic examination, the patient removes her underwear and that the examination will include a visual inspection of the genital region, not just a manual exam.

On redirect examination, Dr. Pagan explained that Dr. Stoner was more qualified than he, Dr. Pagan, to perform breast examinations because of his background in

breast cancer research. Dr. Pagan also acknowledged that there are certain situations where he would have performed a pelvic examination in the way Dr. Stoner did, *i.e.,* standing at the patient's side, without having the patient's underwear removed and without a visual inspection.

Next, Robin Smith, who has worked for Dr. Pagan since 1998, testified. Her duties include patient evaluations, histories, appointment scheduling, insurance issues, and phone calls and therapy. She confirmed Dr. Pagan's description of the office policy at the time of AMS's exam, *i.e.,* that a staff member was not physically present during each physical examination of a female patient. However, Smith explained that typically she was "in and out of the [examination] room, grabbing papers, getting consents signed, answering phones, and—but always popping in and out of the room." *Id.* at 80; R.R. 226a.

Finally, Dr. Stoner testified on his own behalf. He stated that he earned his medical degree at the University of Chile, where medical training focuses on clinical medicine. This means that each physician, regardless of specialty, is trained to be prepared to respond to all medical needs of a patient. Dr. Stoner explained that in the course of his medical training, he did a rotation in OB/GYN, during which he performed hundreds of pelvic exams and delivered over 50 babies, including 12 by caesarean section. N.T. 5/10/07, at 95; R.R. 230a. After he returned to the United States, Dr. Stoner was appointed to a fellowship at the University of Pittsburgh where he worked for Dr. Fisher in the largest breast cancer study in the world. After this fellowship, he entered a pathology residency. He has been board-certified in pathology since 2002 and holds medical licenses from Pennsylvania and West Vir-

ginia. He refocused his practice to pain management because it was difficult to maintain a pathology practice in a rural area.[3]

Dr. Stoner testified that patients often comment that he and Dr. Pagan spend more time with their patients and are more thorough in their examinations than most physicians. He stated that he spends about 45 minutes with a patient at his or her initial examination.

With respect to MKH's breast examination, Dr. Stoner testified that he did one because she had not seen a doctor in years. Further, she told him she did not know how to do a self-exam. He performed the exam as he was taught: while the patient is lying down, with her hand tucked behind her head. He also explained that it is necessary to compress the nipple to check for any discharge and to check the entire breast and the nearby lymph nodes.

With respect to MKH's pelvic examination, Dr. Stoner explained he did one because she did not have a primary care physician or an OB/GYN physician. If she had, Dr. Stoner would have referred MKH's complaint of premenstrual vaginal discharge to that physician. He was also concerned that MKH was uncertain about whether she was pregnant, having answered both "yes" and "no" to that question on her patient questionnaire. MKH told him of a recent trip to the emergency room for anxiety disorder, causing him to posit that MKH's anxiety stemmed from her uncertainty about whether she was pregnant. In light of MKH's specific complaints, Dr. Stoner thought he would be at fault if he did not do a pelvic exam. Dr. Stoner told MKH that he was going to do

---

**3.** He began pain management training in 1997. He is certified by the Academy of

Sclerotherapy and treats varicose veins with sclerotherapy, *i.e.,* injections to close veins.

a pelvic examination before he did so, and she did not object.

Dr. Stoner described the pelvic examination in question. He asked MKH to place her legs on the table in a bent-knee position, and he stood on the right side of the table. He moved her underwear to one side and inserted two fingers of his gloved right hand into her vagina and placed his gloved left hand on her abdomen. With his left hand he palpated the uterus, and with his right hand he examined the cervix and vagina. Dr. Stoner explained that this type of bimanual exam will detect pregnancy or pelvic inflammatory disease, which he thought might be responsible for MKH's discharge. He asked MKH how it felt or whether the exam caused pain, because pain can indicate inflammatory disease. Dr. Stoner categorically denied intentionally touching MKH's clitoris at any point during the pelvic examination, but he acknowledged that inadvertent contact was a possibility. Dr. Stoner disputed MKH's description of the pelvic examination, and he stated that the length of the pelvic exam was approximately 30 seconds. He testified that at no point did MKH indicate that she was in any way troubled by the pelvic examination. He opined that the pelvic examination was medically necessary, given her stated concerns.

Dr. Stoner testified that he performed the range-of-motion test because MKH complained of back and leg pain from prolonged standing at her job. Dr. Stoner agreed that he said "Aha," during the range-of-motion test because MKH's hip and trunk movement was slightly restricted; he categorically denied saying "ooh" or "aah" or "um-hum" while he observed MKH perform the stretches.

Dr. Stoner denied that MKH had attempted to cancel her appointment prior to appearing at his office on October 3, 2003. He noted that the package of upgraded Sam's Club membership information was too voluminous to fax. The only concerns MKH ever expressed were financial, and she was satisfied with his proposed payment plan.

On cross-examination, Dr. Stoner acknowledged that he did not do a swab of MKH's vaginal discharge for a pathological test. He explained that based on his observations, he believed MKH's discharge was not caused by a bacterial infection but, rather, a minor fungal infection treatable by over-the-counter medications. He so advised MKH. Dr. Stoner showed MKH's chart to the police who questioned him the day after receiving MKH's complaint. His actual medical notes on MKH's examination were dictated several days later, in accordance with his standard practice.

Regarding AMS, Dr. Stoner stated that he did a breast exam on AMS and then showed her how to do a self-examination because it was breast cancer awareness month and because she was a nursing student. She voiced no objection to the exam. He denied ever touching AMS's genital area in the course of administering injections at any time in the course of her pain treatment between August 2004 and February 2005. With respect to his suspicions of AMS's abuse, Dr. Stoner explained that AMS's mother had complained to him that unexplained bruises had appeared on AMS's face and body. Dr. Stoner testified that AMS's father continued to seek treatment from Dr. Stoner; Dr. Stoner had seen AMS's father one week before the hearing.

### The Board's Adjudication.

On December 18, 2008, the hearing examiner issued a proposed adjudication. He found MKH's testimony credible and found that Dr. Stoner "improperly touched the patient's vagina ... [, and] rubbing her clitoris for approximately two minutes ...

was outside the scope of accepted medical practice." Proposed Adjudication at 21; R.R. 430a. On the other hand, the hearing examiner held that the evidence "did not support a finding that [MKH's breast examination] occurred outside the scope of accepted medical practice." *Id.* at 17; R.R. 426a. The hearing examiner did not find AMS's testimony credible in any respect and, thus, he recommended that AMS's complaint be dismissed.

Because of Dr. Stoner's "improper touching" of MKH, the hearing examiner recommended that Dr. Stoner's medical license be suspended for one year; that he undergo a psychiatric evaluation; and that he complete a training course in physician-patient sexual boundaries. On December 22, 2008, the Board gave notice of its intent to review the decision of its hearing examiner. Both the Bureau and Dr. Stoner filed briefs. On May 27, 2009, the Board revoked Dr. Stoner's license to practice medicine.

Without explanation, the Board rejected the hearing examiner's finding that AMS's testimony was incredible. The Board found that Dr. Stoner's breast examinations were not medically necessary, but it did not reverse the hearing examiner's finding that there was nothing unacceptable about the manner of either examination. The Board found that Dr. Stoner's pelvic examination of MKH was medically unnecessary and did not meet the accepted standard of care. It made the same finding with respect to the injections Dr. Stoner administered to AMS. Based on these findings, the Board concluded that Dr. Stoner violated Section 41(8) of the Medical Practice Act of 1985(Act), which authorizes the Board

to impose disciplinary or corrective measures on a board-regulated practitioner for any or all of the following reasons:

\* \* \*

(8) Being guilty of immoral or unprofessional conduct. Unprofessional conduct shall include departure from or failing to conform to an ethical or quality standard of the profession.

Act of December 20, 1985, P.L. 457, *as amended,* 63 P.S. § 422.41(8). The Board explained this holding as follows:

[Dr. Stoner] engaged in deviant behavior. His patients were victimized. *His course of conduct had no correlation to pain management or standard vaginal and breast examinations.* It is a universal protocol taught in the first year of medical school, never to exam a patient of the opposite sex without a chaperone.

Board Adjudication, 5/27/09, at 21–22 (emphasis added).

### Petition for Review.

On appeal,[4] Dr. Stoner contends that the Board failed to produce any evidence to establish that his examinations of MKH and AMS departed from an ethical or quality standard of the profession. Dr. Stoner further contends that the Board erred in reversing the hearing examiner's credibility determination with respect to AMS because it did so without any explanation, which was required because the Board, unlike the hearing examiner, did not observe AMS's demeanor during her testimony. Finally, Dr. Stoner contends that the Board did not apply the correct burden of proof required in professional licensing

4. This Court's scope of review of the Board's order is limited to determining whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial evidence. *Barran v. State Board of Medicine,* 670 A.2d 765, 767 n. 3 (Pa.Cmwlth.1996).

cases, *i.e.*, preponderance of the evidence that is clear and satisfactory. *See Starr v. State Board of Medicine,* 720 A.2d 183, 191 (Pa.Cmwlth.1998) (quoting *In re Shigon,* 462 Pa. 1, 17, 329 A.2d 235, 243 (1974)). "Clear and satisfactory evidence" is required because of what is at stake: a highly trained professional may lose his ability to earn a livelihood and suffer damage to his professional and personal reputation. *See In re Berlant,* 458 Pa. 439, 441, 328 A.2d 471, 473 (1974). Dr. Stoner contends that the vague and at times inconsistent testimony of MKH and AMS do not meet the clear and satisfactory evidence standard.

The Board counters that it is free to reject the hearing examiner's credibility findings in favor of its own. It then argues that the "evidence is clear that Dr. Stoner had no reason to perform a pelvic and/or breast examination" of either MKH or AMS. Board Brief at 8. It also argues that it is "abundantly apparent" that the pelvic examination of MKH in question did not meet "the accepted standard of care." Board Adjudication at 19. Thus, the examinations of MKH and AMS constituted sexual misconduct. The Board argues that the testimony of MKH and AMS was sufficient evidence to prove unprofessional and immoral conduct by Dr. Stoner.

### Applicable Statutory Law.

As noted above, Section 41(8) of the Act authorizes the Board to discipline a physician for being "guilty of immoral or unprofessional conduct." 63 P.S. § 422.41(8). Immoral or unprofessional conduct is that which fails to "conform to an ethical or quality standard of the profession." *Id.*

Section 41(8) illuminates what is meant by an "ethical or quality standard" as follows:

In proceedings based on this paragraph, actual injury to a patient need not be established.

(i) The ethical standards of a profession are those ethical tenets which are embraced by the professional community in this Commonwealth.

(ii) *A practitioner departs from, or fails to conform to, a quality standard of the profession when the practitioner provides a medical service at a level beneath the accepted standard of care.* The board may promulgate regulations which define the accepted standard of care. In the event the board has not promulgated an applicable regulation, *the accepted standard of care for a practitioner is that which would be normally exercised by the average professional of the same kind in this Commonwealth under the circumstances,* including locality and whether the practitioner is or purports to be a specialist in the area.

63 P.S. § 422.41(8)(i)-(ii) (emphasis added).

■ In sum, immoral and unprofessional conduct occurs when a physician deviates from the standard of care expected of a physician of the same specialty practicing in the same geographical area.

### MKH Pelvic Examination.

■ The Board found that Dr. Stoner's pelvic examination of MKH failed to meet the accepted standard of medical care for the following reasons: he did not visually inspect her pelvic region; he did not take a sample of MKH's unusual vaginal discharge for laboratory analysis or prescribe medication for this condition; and he did not perform a PAP smear. The Board also found that MKH's pelvic examination was medically unnecessary and, thus, should not have been done at all.

The Bureau did not present any expert testimony on the accepted standard of care, let alone an expert who practiced medicine in the same area as Dr. Stoner, as is required by Section 41(8)(ii) of the Act. The Board simply lacked any basis in the record for finding that because Dr. Stoner did not do a visual inspection, a laboratory analysis of MKH's vaginal secretions or a PAP smear, his exam did not meet the accepted standard of care. The same is also true with the Board's conclusory declaration that the pelvic examination was medically unnecessary.[5]

The Board's finding of sexual misconduct was based upon its finding that Dr. Stoner did not meet the accepted standard of care in the above-listed ways. A substandard examination of any sort may constitute malpractice. Here, however, the Board held that in the case of a pelvic examination, a substandard examination constitutes sexual misconduct within the meaning of Section 41(8) of the Act. This is not completely logical. It is not obvious that the failure to do a PAP smear evidences sexual misconduct. In any case, the record is devoid of evidence that Dr. Stoner's failure to do a PAP smear departed from the accepted standard of care. The Board did not have to accept Dr. Stoner's explanation for why he did not do certain tests. However, expert testimony was needed to show that not doing these tests departed from the accepted standard of care in New Castle. *See* Section 41(8) of the Act, 63 P.S. § 422.41(8)(i)-(ii).

The touching of MKH's external genitalia is problematic. It is the prerogative of the Board, not this Court, to make findings of fact. It is equally true that the Board's factual findings must be supported by substantial evidence. Five years after the pelvic examination took place, MKH testified that Dr. Stoner's pelvic exam lasted "*maybe* one to two minutes." N.T. 5/09/07, at 92; R.R.34a (emphasis added). This statement does not support a definitive finding about the duration of the examination; it is not even inconsistent with Dr. Stoner's testimony that the exam lasted 30 seconds. We must accept the Board's finding that Dr. Stoner touched MKH's external genitalia; however, the nature of the touching and its duration are uncertain given MKH's testimony. She did not assert that Dr. Stoner was attempting to arouse her. She testified that she did not observe signs of sexual arousal on his part, and she was clear that Dr. Stoner did not make any overt sexual statements or gestures. It cannot be reasonably inferred from the fact that Dr. Stoner touched MKH's external genitalia in the course of examining her internal genitalia that a sexual assault occurred. What is lacking in the record is expert testimony to explain why Dr. Stoner's explanation of the "possible" incidental touching was not believable, given the accepted standard of care for a pelvic examination. Instead, the Board simply made the conclusory finding that it was "abundantly clear" that the touching deviated from the accepted standard of care.

The Board's other reasons for finding immoral and unprofessional conduct with regard to MKH's pelvic examination are likewise flawed.

The Board suggests that Dr. Stoner should have referred MKH to a dermatologist for her skin conditions and did not do so because he wanted to take advantage of her. The Board offered no expert testimo-

---

5. The Board did not explain why a pelvic examination was unnecessary. It may be that it did not believe MKH's uncertainty about pregnancy or unusual discharge were factually established. MKH's testimony was contradictory, but the questionnaire showed "yes" and "no" in response to the pregnancy question.

ny, or any evidence, to show that only a dermatologist was qualified to treat MKH's skin conditions.

The Board found that Dr. Stoner demonstrated a "pattern and practice" of immoral and unprofessional conduct because he has "done this 10 times over the last several years." Board Adjudication at 21–22. The "this" refers to pelvic examinations. It does not follow from Dr. Stoner's testimony that because he has performed approximately ten pelvic exams over the past decade, that each and every examination was inappropriate and medically unnecessary. It is at odds with the testimony of Dr. Pagan that sometimes a pain management specialist will do a pelvic examination, *i.e.*, where a particular patient presented with complaints that warranted such an examination.

The Board found that it is a "universal protocol" that any physical examination of a patient of the opposite sex must be conducted in the presence of a chaperone, as every physician is "taught in the first year of medical school." Board Adjudication at 22. Dr. Stoner's disregard of this "universal protocol" was one of the Board's stated grounds for finding that he acted immorally and unprofessionally. The Board does not cite any regulation, medical guideline or testimony of record to support the existence of such a "universal protocol." Further, because evidence about this universal protocol was not presented at the hearing, Dr. Stoner was not afforded an opportunity to refute its existence. The Board's finding about the "universal protocol" is belied by Dr. Pagan's testimony that it was not routine to have a chaperone present during every physical examination of a female patient by himself or by Dr. Stoner.

The Board cited to one regulation to support its conclusion that Dr. Stoner acted immorally and unprofessionally. That regulation states that

[s]exual behavior that occurs with a current patient other than the Board-regulated practitioner's spouse constitutes unprofessional conduct, is prohibited and subjects the practitioner to disciplinary action under section 41(8) of the act.

49 Pa.Code § 16.110(b). "Sexual behavior" is "sexual conduct which is non-diagnostic and non-therapeutic." 49 Pa.Code § 16.1. The purpose of this regulation, according to the Board, is to prohibit sexual and romantic relationships between physicians and patients. Board Adjudication at 21.[6] There was no evidence that Dr. Stoner was engaged in a prohibited sexual or romantic relationship with MKH. Neither MKH nor AMS stated that Dr. Stoner's conduct was "sexual;" they testified that he showed no signs of sexual arousal or gratification. There was no expert testimony that a pelvic examination of MKH could not have been done for diagnostic purposes.

In sum, the Bureau did not present any evidence on the accepted standard of care for a pelvic exam, let alone one conducted by a pain specialist and general practitioner in New Castle, Pennsylvania. Accordingly, the Board had no basis for finding that Dr. Stoner's pelvic examination of MKH fell below that standard. Accordingly, it had no basis for concluding that Dr. Stoner committed immoral and unprofessional conduct in his pelvic examination of MKH.

**Breast Examination of MKH and AMS.**

The ALJ found that the breast examinations of MKH and AMS did not violate

---

**6.** The Board cited *Marrero v. Commonwealth, Bureau of Professional and Occupational Affairs,* 892 A.2d 854 (Pa.Cmwlth.2005) for the proposition that licensed physicians may not engage in romantic and sexual relationships with patients. However, that case did not involve 49 Pa.Code § 16.110(b).

Section 41(8) of the Act, citing a lack of evidence. The Board found that Dr. Stoner's breast examinations did violate Section 41(8) because they were medically unnecessary. The Bureau did not present any expert testimony to opine that MKH's breast examination was medically unnecessary. The Board cited to the testimony of MKH, who considered Dr. Stoner's method of breast examination to be "unusual" in certain respects, to find her examination medically unnecessary.

MKH's testimony about the manner of her breast examination was irrelevant to the question of whether the examination was medically necessary. The Board did not cite any regulation that establishes standards for a medically necessary breast examination. The Board did not have to accept Dr. Stoner's explanation for why he performed the breast examination of MKH and AMS. Expert testimony was needed, however, to show that breast examinations of MKH and AMS were not medically necessary.

Although evidence about Dr. Stoner's breast examination of AMS was presented at the hearing, the Order to Show Cause did not allege Dr. Stoner's breast examination of AMS was unprofessional or immoral, as noted by the hearing examiner. C.R., Item No. 16, at 19 n. 14. Because Dr. Stoner was not charged in any way for his breast exam of AMS, her testimony was irrelevant. He cannot be sanctioned for conduct not identified in the Order to Show Cause.

### AMS Complaint.

■ The Board found that Dr. Stoner touched AMS's vaginal area while injecting her buttocks when it was not medically necessary to do so. AMS was receiving injections to her buttocks for knee and low back pain management. AMS testified that Dr. Stoner touched the area of her vagina in the course of administering an injection. The hearing examiner found that AMS's testimony was not credible because she was not able to specify even the month when this incident occurred. In addition, AMS continued to see Dr. Stoner for months after the alleged incident. She was also vague about exactly where Dr. Stoner touched her, stating only that it was in the "vaginal area." This could be any place below the waist, including the lower buttocks where the injections were administered.

The Board reversed the hearing examiner's credibility determination of AMS without explaining why it did so. The Board merely stated that it found AMS's testimony credible and Dr. Stoner's testimony not credible. In *Peak v. Unemployment Compensation Board of Review,* 509 Pa. 267, 278, 501 A.2d 1383, 1389 (1985), our Supreme Court held that an administrative tribunal may reassess a hearing examiner's credibility determinations, but it must "explain its decision in sufficient detail to permit meaningful appellate review." The Board did not satisfy this requirement because it failed to articulate a single reason why it found AMS's testimony credible and why her testimony, if believed, was sufficient to support a finding that Dr. Stoner acted unprofessionally. This failure normally prompts a remand.

However, we will not vacate and remand this matter to the Board. As in the case of MKH, the Bureau presented no evidence to establish the accepted standard of care for Dr. Stoner's injections, much less show that they violated that standard of care. Accordingly, the Bureau did not meet its burden of proving unprofessional or immoral conduct.

### Conclusion.

The Bureau failed to meet its burden of proving that Dr. Stoner's examination or

treatment of either MKH or AMS constituted immoral or unprofessional conduct. The Board was entitled to believe the testimony of MKH and AMS. However, their testimony could not substitute for testimony of a medical expert. Such expert testimony was needed in order to identify the accepted standard of care for breast and pelvic examinations for the factfinder.

 By stating, in conclusory fashion, that it was "clear" that Dr. Stoner deviated from the accepted standard of care, the Board apparently drew on its own knowledge of acceptable and prevailing standards of medical practice. It substituted its expertise for the testimony of the two physicians who testified on Dr. Stoner's behalf. This is not permissible. The adjudicating board cannot rely on the medical expertise of its members. *See Yi v. State Board of Veterinary Medicine*, 960 A.2d 864 (Pa.Cmwlth.2008). A respondent cannot adequately prepare a defense if the evidence of "accepted medical care" is not placed on the record. We explained in *Yi* that

> [t]he Board misapprehends the extent to which it may put its administrative expertise to work. The Board may not substitute its judgment for the expert who did testify, and it may not rely on the knowledge of its Board members to augment the record evidence.

*Id.* at 869. "An agency that uses its specialized knowledge as a substitute for evidence will not have its order sustained." *Id.* (citing *Baltimore & Ohio Railroad Co. v. United States*, 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667 (1924)).[7]

The Bureau believed that Dr. Stoner's examinations of MKH and AMS were not done for diagnostic reasons but for sexual reasons. There is no dispute that the examinations were done. Had Dr. Stoner been a licensed accountant, the examinations could not have been justified as having any legitimate purpose. The problem is that Dr. Stoner is licensed to perform breast and pelvic examinations. Neither MKH nor AMS claimed that Dr. Stoner derived sexual pleasure from their examinations. Neither claimed that they were undertaken to give the patients sexual pleasure. The Bureau's theory that Dr. Stoner committed sexual misconduct was based on the premise that his examinations did not meet the "accepted standard of care" for such examinations, but the record lacks evidence to support this premise.

The Board must protect patients from predatory physicians who undertake medical procedures for any purpose, whether financial or sexual, other than the advancement of the health of the patient. The Board must also observe the rights of physicians, who have invested a great deal of time and resources in becoming a member of the profession. A case of alleged sexual misconduct arising from an examination of a patient's sexual organs presents a particular challenge because physicians are licensed to conduct such examinations. Expert testimony is essential in such a case. The Bureau did not present expert medical testimony on the accepted standard of care for, or medical necessity of, a pelvic or breast examination and, thus, did not meet its burden of proof.

For the foregoing reasons, we reverse the Board.

### ORDER

AND NOW, this 22nd day of November, 2010, the order of the State Board of Med-

---

7. In light of our disposition of the threshold issue, we do not need to address Dr. Stoner's remaining argument that the Bureau's evidence did not meet the standard of proof required in a professional licensing case, *i.e.*, preponderance of the evidence that is clear and satisfactory.

icine, dated May 27, 2009, in the above-captioned matter is hereby REVERSED.