v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 16, 2011.

Decided Feb. 28, 2012.

Thomas J. Ruth, Corry, for petitioner.

Daniel M. Fellin, Harrisburg, for respondent.

Gabrielle F. Pierce, Meadville, for intervenor Crawford County Children and Youth Services.

BEFORE: LEADBETTER, President

Judge [1], and McGINLEY, Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge.

OPINION BY Judge PELLEGRINI.

T.W. (Perpetrator) petitions for review of an adjudication of the Secretary of the Pennsylvania Department of Public Welfare (Department) which granted Crawford County Children and Youth Services' (CYS) application for reconsideration of the decision entered by the Bureau of Hearings and Appeals (Bureau), set aside CYS' decision, and denied the Perpetrator's appeal to expunge an indicated report of child abuse by the Perpetrator from the ChildLine Registry.[2] For the reasons that follow, we affirm the Department's adjudication.

This case involves C.H. (the child), a female child who was born on February 3, 2005, and was three years old at the time of the allegations that she was sexually abused by the Perpetrator, her step-grandfather. S.H. is the child's mother, and the Perpetrator is married to L.W., the child's maternal grandmother. From July 2005 through July 2007, the Perpetrator and the child's maternal grandmother were the child's court-appointed guardians and had physical custody of her. In July 2007, the child was returned to the custody of her mother. In September 2008, at the time of the alleged sexual abuse, the child lived in an apartment with her mother and her younger sister, E.H.

On September 10, 2008, CYS received an oral report that an incident of child abuse had occurred on September 8, 2008, while the child and her mother had been visiting the Perpetrator at his home. Specifically, the child had told her mother that the Perpetrator had "touched her 'down there' and went in all the way with his fingers." (Reproduced Record at 3.) The child was examined by a physician several days after the alleged incident but no evidence of trauma was found, only a possible yeast or urinary tract infection. As part of CYS' investigation, on September 18, 2008, the child was medically examined at the Emergency Department at Saint Vincent Health Center (SVHC) by Rhonda Henderson (Nurse Henderson), a Forensic Nurse Examiner. On that date, Nurse Henderson made a report noting findings of a vaginal tear and swelling. The report also noted her conversation with the child in which the child stated that the Perpetrator had put his finger into her vaginal area while she was in the tub naked. CYS also conducted an interview with the child at the end of September 2008, in which she identified the Perpetrator as her abuser. The child was again physically examined at SVHC on October 1, 2008, with Nurse Henderson finding that the vaginal or hymenal tear was healing and there was also evidence of several anal tears that were also healing. As a result of this information, the Department issued an indicated report on November 7, 2008, that the Perpetrator had sexually abused the child. The Perpetrator denied the allegations and filed a request to expunge the indicated report.

A hearing was held before an Administrative Law Judge (ALJ) on June 15,

1. This case was assigned to the opinion writer before Judge Pellegrini succeeded Judge Leadbetter as President Judge.

2. ChildLine is a unit of the Department of Public Welfare that operates a statewide toll-free system for receiving and maintaining reports of suspected child abuse along with making referrals for investigation. 55 Pa. Code § 3490.4. The ChildLine Registry is maintained in accordance with 23 Pa.C.S. §§ 6301–6386.

2009,[3] at which time Lisa Pierro (Pierro), a forensic interviewer for CYS, testified that she interviewed the child on September 26, 2008, recorded the interview by audio and video and had three other individuals watching the interview from outside the room.[4] The child told her that "Poppy" had touched her in her private area, pointing to her vaginal area, and told Pierro that that part of her body was used for peeing. The child told her that she was naked when it happened and that she was in the bathtub. The child also told her "Poppy's" first name was "T." Pierro stated that the child was fairly comfortable talking about the incident while she was coloring and doing things during the 15–minute interview, and at one point, she stood up and showed Pierro "what he did and where it was." (June 15, 2009 Hearing, Notes of Testimony at 97.) Pierro also noted that the child told her these things with very little prompting, very matter of fact.

The child, who was four years old and four months at the time of the hearing, testified that she did not remember that she had ever discussed the alleged abuse with anyone at CYS or that she had gone to the hospital for examinations. She denied being touched inappropriately by the Perpetrator. However, she admitted that the Perpetrator had taken a bath with her while he was naked (June 15, 2009 Hearing, Notes of Testimony at 33), and stated that the last time she had a bath with him she did not want to but her mother made her. (June 15, 2009 Hearing, Notes of Testimony at 37.) The child also stated that her mother and grandmother were home at the time of the baths but the door was closed, and they did not come into the bathroom at all. (June 15, 2009 Hearing, Notes of Testimony at 35.)

Nurse Henderson testified regarding her first examination of the child on September 10, 2008, stating that the child told her that she was familiar with the male genitalia by calling a man's "private part" a "stick-out thing" and then spontaneously stating that "Poppy showed me his stick-out thing." (June 15, 2009 Hearing, Notes of Testimony at 56.) When Nurse Henderson asked who "Poppy" was, the child identified the Perpetrator's first name. Nurse Henderson continued to state that the child volunteered to her that Poppy showed her his stick-out thing all the time, had his clothes off in the bathtub, got in the tub with her, and put his finger in her private part. The child told Nurse Henderson that it hurt and she told the Perpetrator not to do that anymore. The child told Nurse Henderson that she told the Perpetrator that she would wash herself and not to do that.

Nurse Henderson then described the actual physical exam on September 10, 2008, with the child's mother in attendance. She stated that she generally used two positions to examine children: a frog-leg position for the vaginal exam and a knee-chest position for the anal exam. While doing the frog-leg position with the child on her back and her feet in the air and using a clock as a reference, Nurse Henderson

---

3. The burden of proof in an expunction hearing is on the Child Protective Services county agency and/or the Department to show by substantial evidence that the indicated report is accurate. *Bucks County Children and Youth Social Services Agency v. Department of Public Welfare,* 808 A.2d 990 (Pa.Cmwlth. 2002). *See also* 55 Pa.Code § 3490.106.(f)(2). The county agency's evidence must outweigh any contrary evidence. *C.F. v. Department of Public Welfare,* 804 A.2d 755 (Pa.Cmwlth. 2002).

4. Those individuals were State Trooper Neiswonger from the Corry State Police barracks; Mary Serra from CYS; and Paula DiGiacomo from the District Attorney's office.

stated that from ten o'clock to 12 o'clock and 12 o'clock to three o'clock there was a hypovascularity—a redness present caused by some sort of irritation. There was an appearance of a tear from nine o'clock to six o'clock. From the labia major, she noted a healing superficial tear at six o'clock approximately one centimeter. Nurse Henderson stated that the injury that the child had was consistent with a penetrating type of injury and was consistent with digital penetration. She also stated that when she attempted to do the knee-chest position for an anal exam, the child began sobbing and she could not perform the examination.

Regarding the October 1, 2008 exam, Nurse Henderson stated that the child told her that she remembered her first visit and when asked if anyone had touched her, she said "Poppy." When Nurse Henderson asked the child where she had been touched, the child pointed to her crotch and anal area. When asked with what she had been touched, the child replied, "his finger." Regarding her physical exam, Nurse Henderson stated that she was able to perform both types of tests and found evidence of healing tears to the vaginal and anal areas, specifically, four separate tears in the child's anal tissue.[5] Nurse Henderson opined that the injuries she saw on September 18, 2008, likely occurred within two weeks before her first examination, and the anal injuries also occurred during that same time frame and perhaps during the same reported incident. She presented photographs of the injuries she described along with her reports.

The Perpetrator testified that he had been married to the child's grandmother for 10 years and had two children, a girl age 14 who lived with him and a son age 24. He also had a total of five grandchildren. The Perpetrator adamantly denied that he ever sexually abused the child and he did not bathe with her or sexually abuse her on September 8, 2008. He admitted that he did take baths with her prior to September 2008 but when he did, it was because his wife would bring her in and ask him to clean her up. However, he would always have swimming trunks on. (June 15, 2009 Hearing, Notes of Testimony at 108.) He explained that either his wife or the child's mother would be in there with him to clean her up and wash her hair. (June 15, 2009 Hearing, Notes of Testimony at 123). The Perpetrator could not remember the last time he actually took a bath with the child because it had been so long ago and he did not make it a habit. He also told the child that she was getting too old to take a bath with him even though she was bound and determined to come into the bathtub while he was bathing. (June 15, 2009 Hearing, Notes of Testimony at 111.) The Perpetrator testified that he did take baths by himself to relax after work. The Perpe-

---

**5.** Nurse Henderson testified regarding the anal tears as follows:

This is a photo of the anal exam. It demonstrates that there is a healing tear here. And it kind of goes off a little bit there, which would be the five o'clock position. This one here would be the seven o'clock position. There was a healing tear that extended up through here at 11 o'clock. And it doesn't show it very well, but there's one here at three o'clock. This is just showing, with a little bit of traction on the tissue, again—so if you looked at it closely you can see the inside anal tissue here and the healing tear at five o'clock. There's one at seven o'clock. We have this one at three o'clock and this one at 11 o'clock would actually—extends down into the anal canal. The same thing, this one just shows this one here at seven o'clock a little bit better, how it extends into the anal canal, seven o'clock, three o'clock and 11 o'clock.

(June 15, 2009 Hearing, Notes of Testimony at 75–76.)

trator noted that whenever a child was getting a bath, the door always remained open. He also denied that the child called him "Poppy" and instead stated that she always called him "Papa." (June 15, 2009 Hearing, Notes of Testimony at 117.)

The child's grandmother testified that she was the child's grandmother. She stated that previously, her daughter had been unstable and irresponsible due to substance abuse problems and she and her husband had received primary physical custody of the child from July 2005 through July 2007. The child's grandmother admitted that her husband had bathed with the child at times but it was always with her in the bathroom. The child's grandmother denied that the Perpetrator was ever naked in the bath with the child or any of the grandchildren, and she was always in the bathroom helping him bathe the child. The child's grandmother stated that the Perpetrator never exposed himself to the child, the child never complained of pain and never cried. The child's grandmother could not remember the last time a bath took place at her home, but she said it was not a common occurrence and only happened when her daughter was over their house when the girls were little. On cross-examination, however, the child's grandmother stated that sometime in September, her daughter came over to her home to do laundry, and the child did take a bath with the Perpetrator.[6] The child's grandmother also admitted that she talked to the child prior to the hearing and asked her "do you remember talking to some strange people that I don't know and that you probably don't remember, but saying something that you

said Papa did to you." (June 15, 2009 Hearing, Notes of Testimony at 143.)

Last to testify was L.B. (Aunt), also a step-daughter of the Perpetrator and aunt to the child. The Aunt stated that she had two young boys and she allowed the Perpetrator to babysit them whenever she did not want to pay for a babysitter, which was just a few months prior. She testified that she never had any concerns with the Perpetrator being alone with her children and described him as the perfect grandfather. She did not believe what her sister and niece were accusing him of doing. She stated that whenever the Perpetrator would bathe his granddaughters, he would always wear swim shorts. Further, everyone would always be in the house and the bathroom was not far from the living room. "And you can pretty much see from all the back bedroom areas, the bathroom. And you can hear, from the living room, anything that goes on in the bathroom. And when he gave baths, the door was always open." (June 15, 2009 Hearing, Notes of Testimony at 156.) She stated that her mom would sometimes go in there and sometimes she would go in there. As for her sister, she stated that sometimes her sister would drop her girls off at the Perpetrator's house and ask them to take the kids. However, she was not at the Perpetrator's house in September on the date in question.

The ALJ admitted the child's hearsay disclosures to Pierro based upon Pierro's testimony and found the testimony of Pierro and Henderson credible. She rejected the child's testimony on the day of the hearing as not credible because the child's

---

**6.** The child's grandmother recounted an event on September 9, 2008, when she stopped at her daughter's apartment and the child arrived home from daycare not looking well. The child told her grandmother that she had to go to the bathroom because "it hurts, it hurts." (June 15, 2009 Hearing, Notes of Testimony at 138.) The child's grandmother told her daughter that she thought the child had an infection because she could not go to the bathroom and she should call the doctor.

grandmother had questioned the child prior to the hearing and tainted the child's testimony. The ALJ also found the Aunt's testimony credible, but rejected the testimony of the Perpetrator and the child's grandmother as not credible. Based on these credibility determinations and the physical evidence of penetration, the ALJ found that the Perpetrator had sexually abused the child. However, pursuant to Section 6303(a) of the Child Protective Services Law (Law), 23 Pa.C.S. § 6303(a), the ALJ found that the Perpetrator was not a "perpetrator" of sexual abuse within the meaning of that statute. Under that section of the Law, a "perpetrator" is defined as "[a] person who has committed child abuse and is a parent of a child, a person responsible for the welfare of a child, an individual residing in the same home as a child or a paramour of a child's parent." Because the injuries alleged to have occurred in September 2008 happened when the child no longer lived in the Perpetrator's house and he was no longer her legal guardian, the ALJ determined that the Perpetrator did not meet any of these definitions.[7]

 The Bureau adopted the ALJ's recommendation and ordered the indicated report of abuse by the Perpetrator be expunged. CYS requested reconsideration from the Department arguing that a "perpetrator" included anyone who was responsible for the welfare of a child, which included a person who provided temporary care or supervision. It contended that the record established that the abuse occurred when the Perpetrator was the only adult in the bathtub, and he was at least temporarily responsible for the welfare of the

child, thereby satisfying the statutory definition. The Department agreed, granted reconsideration, and issued a final order setting aside the Bureau's order and denying the Perpetrator's appeal. The Department stated:

> Regulations, in pertinent part, define a "person responsible for the child's welfare" as a person, who provides permanent or **temporary** care, supervision . . . in lieu of parental care, supervision and control. 23 Pa.C.S.A. § 6303(a).

> Here, the hearing transcript reveals that the Appellant babysat the child and even bathed her at times, with no other adult present. As such, I find that the Appellant is a person, who was responsible for the child's welfare and provided **temporary** care, when the parent was not present.

(Reproduced Record at 72.) This appeal by the Perpetrator followed.[8]

 23 Pa.C.S. § 6303(a) defines **"Perpetrator"** as "[a] person who has committed child abuse and is a parent of a child, *a person responsible for the welfare of a child,* an individual residing in the same home as a child or a paramour of a child's parent." 23 Pa.C.S. § 6303(a) then defines **"Person responsible for the child's welfare,"** in pertinent part, as:

> A person who provides permanent *or temporary care, supervision,* mental health diagnosis or treatment, training or *control of a child in lieu of parental care, supervision and control.*

(Emphasis added.) If a child is injured while in the temporary care, supervision and control of a person, that person could

---

7. The ALJ also found that the child's grandmother was not a "perpetrator" under this definition.

8. Our scope of review is limited to determining whether a legal error has been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence. *K.J. v. Department of Public Welfare,* 767 A.2d 609 (Pa.Cmwlth.2001).

be held criminally responsible if that conduct was deemed to be criminally negligent. "In lieu of parental care, supervision and control" does not necessarily mean that the parent has actually entrusted the child to the temporary care of the other person, but it presumes that the person who has taken over that responsibility will provide the same care and supervision while the child is on his or her watch.

In this case, the Perpetrator argues that he did not even have temporary control of the child because he was never alone with the child in September 2008 as the child's mother or grandmother was in the bathroom during the bath. The Perpetrator's argument fails for two reasons.

First, although he contends that he only took a bath with the child in September 2008 while either the child's mother or grandmother was present, neither the ALJ nor the Department found him credible. They also did not find his wife credible that someone was always in the bathroom with him while he bathed his grandchildren. (*See* Finding of Facts 25 and 30.)[9] While the ALJ did not find the child's testimony credible, the Secretary of the Department did, and the Secretary is designated with final fact finding authority in expunction cases. See *A.O. v. Department of Public Welfare*, 838 A.2d 35 n. 4 (Pa. Cmwlth.2003). In stating that "the hearing transcript reveals that the [Perpetrator] babysat the child and even bathed her at times, with no other adult present" (June 23, 2010 Order), the Secretary implicitly found that portion of the child's testimony credible when she stated that the door to the bathroom was closed when she took baths with the Perpetrator who was naked, and that no one came into the bathroom during those times. Because the Secretary did not find the Perpetrator credible but did find the child's statement that she bathed alone with the Perpetrator to be credible, that constitutes substantial evidence to support the Department's conclusion that the Perpetrator bathed the child at times with no other adult present.

Second, even if the Perpetrator was not alone with the child and the child's mother was in the bathroom while the Perpetrator was bathing the child, the Perpetrator's argument still fails because he still would have had temporary care of the child in lieu of her mother as he was primarily responsible for the child's safety while bathing her. He would have been supervising and controlling the child because he alone was in charge of her safety while in the bathtub. As for the grandmother being present, the question of who was supervising the child would not even be an issue because the grandmother was not a parent, and the statute would not apply.

Consequently, because the only facts found credible by the Department were that the Perpetrator was alone naked with the child while bathing her when the sexual assault took place, Perpetrator meets the definition of a "person responsible for the child's welfare" and a "perpetrator."

Accordingly, the order of the Department is affirmed.

### ORDER

AND NOW, this 28th day of February, 2011, the order of the Commonwealth of

---

9. Finding of Fact 25 provides: "In early September 2008, subject child, her mother and younger sister were at her mother's home doing laundry when [Perpetrator] bathed subject child and her sister. (N.T. 138–147.)" At those pages of testimony, the child's grandmother testified that the Perpetrator was nev-

er in the bathroom alone with any of his grandchildren. However, in Finding of Fact 30, the ALJ found "The testimony of [the Perpetrator] and [the child's grandmother] was not accepted as credible." (Reproduced Record at 56.)

Pennsylvania, Department of Public Welfare, dated June 23, 2010, is affirmed.

## DISSENTING OPINION BY Judge LEAVITT.

The Child Protective Services Law defines a "perpetrator" as a person who provides care for a child "in lieu of" the parent. 23 Pa.C.S. § 6303(a). The majority holds that one can be acting in lieu of a parent even if the parent is present, which departs from the words of the statute. In any case, the factual findings of the adjudication are so elliptical and contradictory, they escape meaningful appellate review. For these reasons, I respectfully dissent.

The ALJ found that T.W. (Grandfather) had sexually abused his step-granddaughter C.H. (Child) while giving her a bath. At the hearing, Child, who was four years old at the time, testified that she and Grandfather were alone in the bathroom on the day identified by Children and Youth Services (CYS) as the day on which Child was abused. However, Child also testified at the hearing that Grandfather did not touch or hurt her and that she liked taking baths with him. The ALJ found Child's hearing testimony "non-sensical" and assigned it zero credibility. In-

stead, the ALJ based her finding of sexual abuse upon Child's out-of-court statements to Rhonda Henderson, a forensic nurse and Lisa Pierro, a CYS employee, that Child had made nine months earlier. Notably, Child's statement to Pierro was recorded on videotape, but CYS did not offer that recording into evidence. Grandfather adamantly denied abusing Child and denied that he was ever alone with Child on the day in question, but his testimony was not believed by the ALJ.[1]

Notwithstanding the ALJ's finding that Grandfather abused Child, she concluded that he was not a "perpetrator" within the meaning of the law because he was not providing care "in lieu" of Child's mother (Mother) when the abuse occurred. The ALJ made one factual finding relevant to whether Grandfather had custodial responsibility for Child when the abuse occurred:

> In early September 2008, *[Grandfather] was not* residing in the same home as [Child], a paramour of [Child's] mother or *a person responsible for the welfare of [Child] in lieu of parental supervision.*[2]

ALJ Adjudication, Finding of Fact No. 31 (emphasis added). In support of her decision to grant Grandfather's request to ex-

---

1. Grandfather also testified that he wore swimming trunks while he bathed Child. His wife confirmed Grandfather's statement, but she was not found truthful. Child responded "no" to the question of whether Grandfather wore clothes in the bathtub. Reproduced Record at 88 (R.R.——). The question was ambiguous. Shirts and pants are "clothes;" swimming trunks are not generally termed as "clothes." The "no" response of Child was ambiguous and does not support the majority's assertion that Grandfather was "naked" when he bathed Child. Neither the ALJ nor the Secretary made that finding.

2. A perpetrator is one who commits abuse *and* is responsible for the child who is the victim. Section 6303(a) defines "perpetrator" as

[a] person who has *committed child abuse and is* a parent of a child, *a person responsible for the welfare of a child,* an individual residing in the same home as a child or a paramour of a child's parent. 23 Pa.C.S. § 6303(a) (emphasis added). The statute then defines a "[p]erson responsible for the child's welfare" as

[a] *person who provides* permanent or *temporary care,* supervision, mental health diagnosis or treatment, training or *control of a child in lieu of parental care,* supervision and control....

*Id.* (emphasis added). Stated otherwise, a person must provide care or control of the child "in lieu of" the parent to be a "person responsible." *Id.*

punge the indicated report of abuse, the ALJ explained as follows:

> [Grandfather] was [Child's] legal guardian from July 2005 through July 2007 when, presumably, he would have met the regulatory definition of perpetrator, but *there is simply no evidence presented by [CYS] that [Grandfather] was a perpetrator as that word is defined* by the governing regulation in September 2008.

ALJ Adjudication at 11 (emphasis added).

The Bureau adopted the ALJ's adjudication, and CYS sought reconsideration from the Secretary of Public Welfare. It argued that Grandfather did meet the definition of a perpetrator because he was alone in the bathroom with Child and, thus, was acting in lieu of Mother when the abuse occurred. This temporary custody, CYS argued, made Grandfather a perpetrator. CYS's argument in support of reconsideration closed with the statement that:

> The Bureau failed to consider the fact that [Child] testified that she was alone with [Grandfather] in the bathtub when he abused her. See TR, June 15, 2009, 30–38.

Application for Reconsideration, Reproduced Record at 68 (R.R. ___). In actuality, Child denied any abuse and, in any case, her testimony was found not credible.

The Secretary granted reconsideration and found Grandfather to meet the definition of perpetrator. In support, the Secretary reasoned:

> Here, the hearing transcript reveals that [Grandfather] babysat the child and even bathed her at times, with no other adult present. As such, I find that [Grandfather] is a person who was responsible for the child's welfare and provided **temporary** care, when the parent was not present.

Final Order, ¶ 3, R.R. 72 (emphasis in original). This single paragraph contains the sum total of the factual findings and analysis of the Secretary in her Final Order denying Grandfather's request to expunge the indicated report of abuse.

On appeal, Grandfather argues that the Secretary erred. First, he notes that the ALJ did not find that he was alone with Child during the bath. Second, the "hearing transcript" does not support a finding that the two were alone during the bath. Accordingly, Grandfather argues that the evidence did not establish that he had even temporary custody of Child.

There is a reason why the Child Protective Services Law does not define "perpetrator" as any person who commits an act of child abuse. The ChildLine Registry does not function as a kind of Megan's Law that gives notice to the world of the whereabouts of "indicated" child predators. The ChildLine Registry was established for those needing a background check of prospective child care providers, who might serve as foster parents, teachers or daycare workers. Accordingly, the Child Protective Services Law has given a precise meaning to "perpetrator," *i.e.*, it must be a person who has provided care of a child "in lieu of" the parent. Further, the indicated report of abuse is stricken from the ChildLine Registry when the child victim reaches age 23. 23 Pa.C.S. § 6338(b).

It follows, therefore, that before an agency can issue an indicated report of child abuse, it must be able to provide evidence that the parent, or legal guardian, has transferred control of a child to the person charged with abuse. For example, in *K.J. v. Department of Public Welfare,* 767 A.2d 609 (Pa.Cmwlth.2001), the parents of a victim entrusted the care of their child for 20 minutes to a babysitter, who was found to be a perpetrator by virtue of

his temporary custody. The record in *K.J.* established the transfer of custodial care from the parent to the babysitter.

Here, there is no evidence of a transfer of custody. Grandmother testified that Child herself initiated the bath by asking to join her sister who was already in the bath. Grandmother was not believed.[3] Child testified that Mother made her bathe with Grandfather, suggesting that Mother was present, also defeating a finding of transfer. However, Child was not believed. Indeed, the ALJ dismissed her testimony as "non-sensical." CYS could have called Mother to testify that she transferred temporary custody of Child to her parents, but Mother did not testify. CYS presented no evidence, as found by the ALJ, that Mother had transferred custody of Child to Grandfather. *See* ALJ Adjudication at 11.

Mother's sister (Aunt) was the only family witness whose testimony was credited by the ALJ. She described her parents' home as a "beach resort," with family coming and going. R.R. 117. Aunt is the mother of two young sons, ages six and three, and has also asked Grandfather to allow her sons to join him in the bath on occasions when they got dirty after playing outside. Aunt confirmed that Grandfather wore swimming trunks during these baths, presumably because of the traffic in and out of the bathroom. She herself would often sit in the bathroom and chat with the bathers. Aunt acknowledged that Grandfather had at times bathed her sons with

no other adults in the bathroom, but she also stated that other adults were nearby and the door was always open. Aunt described the house as small, with the bathroom only a few steps from the living room and close enough that "you can hear everything." R.R. 117. Aunt described Grandfather as the "perfect grandfather" and testified that she did not believe the charge of sexual abuse. R.R. 117.

The Secretary found that Grandfather bathed Child, "with no other adult present," based on the "hearing transcript."[4] The Secretary also concluded that the absence of other adults was, in itself, enough to establish Grandfather's temporary custody of Child. There are several problems with the Secretary's findings, beginning with the "hearing transcript," which contains conflicting reports and is missing other critical evidence.

First, there was no testimony from any witness who was found credible by the ALJ that Child was alone with Grandfather during the bath in question. Grandfather and his wife, Grandmother, who is the biological grandmother of Child, both testified. They stated that they bathed Child together and that Child was never alone with Grandfather. Child said she was alone, but she was not believed. Neither Henderson nor Pierro, who were believed, testified that Child ever told them she was alone in the bathroom when the abuse occurred. Aunt, who was believed,

---

3. The ALJ found:
 The testimony of [Grandfather] and [Grandmother] was not accepted as credible.
 ALJ Adjudication, Finding of Fact No. 30.

4. The Secretary's final order after reconsideration is atypical in format. Usually, where the Secretary reverses the Bureau, she issues an adjudication with new findings of fact and conclusions of law, which paves the way for meaningful appellate review. *See, e.g., In re*

*Petition for Formation of Independent School District,* 17 A.3d 977, 983 (Pa.Cmwlth.2011) (case originally remanded because Secretary of Education's adjudication lacked findings of fact and conclusions of law). *See also* Section 507 of the Administrative Agency Law, 2 Pa. C.S. § 507, which requires that all adjudications of a Commonwealth agency "contain findings and the reasons for the adjudication."

did not testify that Child was alone with Grandfather on the occasion in question.

Second, although the Secretary is free to reverse the ALJ's credibility determinations, it is not even clear that this is what the Secretary intended. The ALJ made very specific credibility determinations of the fact witnesses after viewing their demeanor. The Secretary may make different credibility determinations, but they should be express and be explained. In *Stoner v. Bureau of Professional and Occupational Affairs, State Board of Medicine*, 10 A.3d 364, 375 (Pa.Cmwlth.2010), *appeal denied*, —— Pa. ——, 34 A.3d 834 (2011), we explained that the State Board of Medicine could not reverse the credibility determinations of its hearing officer without " 'explain[ing] its decision in sufficient detail to permit meaningful appellate review.' " *Id.* The Pennsylvania Supreme Court has expressly provided that where the adjudicator has the power to reverse the credibility determinations of the hearing officer who actually observed the witnesses, it must explain its decision in sufficient detail to show the finding is based on substantial evidence of record. *R. v. Department of Public Welfare*, 535 Pa. 440, 446, 636 A.2d 142, 145 (1994).

Both Child and Grandfather testified that Grandfather did not touch Child inappropriately or hurt her, but they were not found credible. Aunt testified in support of their statements. Aunt did not testify on the critical factual questions of how and when Mother transferred control of Child or whether Child was bathed on the day in question with "no other adults present." Aunt's testimony, including her statement that Grandfather was "the perfect grandfather," was found credible, but the ALJ did not reconcile this credited character assessment with her finding that Grandfather had sexually abused Child. Neither did the Secretary. The Secretary did not explain whether or what extent she intended to reverse any of the credibility determinations of the ALJ, and this is necessary for meaningful appellate review.

Third, Child's out-of-court statements to Henderson and Pierro attested to sexual abuse. However, neither Henderson nor Pierro testified that Child made any statement relevant to the critical question of how and when Mother transferred control of Child to Grandfather or whether Child was alone in the bathroom with Grandfather. CYS did not offer Child's videotaped interview of Child's statement but, rather, Pierro's testimony about what Child said in the interview.

*A.Y. v. Department of Public Welfare*, 537 Pa. 116, 641 A.2d 1148 (1994), is the leading case on the use and admissibility of a child victim's out-of-court statements. In *A.Y.*, as here, the county Children and Youth Services Agency did not offer either a verbatim transcript of the victim's statement or even a recording.

> Instead, the Agency was able to rely on its own employees' recitation of what the three-year-old stated had occurred. The effect of this procedure was to totally deny the appellant the ability to review or challenge the evidence against her, and perhaps *more importantly, it prevented the hearing officer from having any opportunity to judge the evidence except through the prism provided by the Agency.* We think more is required.

*Id.* at 125, 641 A.2d at 1152 (emphasis added).

This is what happened here. CYS relied upon its own employees' recitation of what the three-year-old Child stated. Neither Henderson's report nor the transcript of Pierro's interview of Child was provided to Grandfather's counsel before the hearing. More importantly, the ALJ was required to judge Child's hearsay statements fil-

tered "through the prism provided by the Agency." This is problematic for two reasons. First, the ALJ found Child's testimony at the hearing non-sensical and not credible and may have reached the same conclusion had she viewed the recorded interview. Second, at least part of Child's statement to Pierro was not believed because it did not make it into the indicated report of abuse. Child reported that after the bath in question, Grandfather took Child's younger sister (Sister) outside to the porch where he "put his finger in her pee pee." R.R. 92. Child also reported to Henderson, according to her notes, that Grandfather hurt Sister and made her cry. Sister was not made a part of the report of indicated abuse.

The majority glosses over the Secretary's failure to make clear findings of fact by concluding that it does not matter whether or not Child was alone with Grandfather during the bath. The majority holds that Grandfather was a "perpetrator" because he had physical control of Child while she was in the bath. Every opportunistic pedophile who snatches a child randomly has physical control of his victim, but the indicated report targets only those abusers who act in lieu of a parent when the abuse occurs. The majority's construction renders the requirement that a perpetrator act "in lieu" of the parent meaningless.

Nevertheless, I agree with the majority that there may be more than one "perpetrator." For example, if Mother had been called as a witness and then testified that she asked Grandfather and Grandmother to bathe Child while she did laundry in the basement, that evidence would show the requisite transfer of parental care. If the ALJ also found that abuse took place in the presence of both grandparents, then both grandparents would be listed in the ChildLine Registry as "perpetrators."

On the other hand, if the only other adult present during the abuse had been Mother, then she, not Grandfather, was the "perpetrator" within the meaning of the Child Protective Services Law. Mother would also be a criminal for not intervening on her daughter's behalf. If Grandfather had committed the abuse while Mother stood by, Grandfather would be acting as Mother's partner in crime and, like all criminals, should be prosecuted. He would not, however, be acting in place of Mother.

The point is that a "perpetrator" is one who acts in lieu of a parent. CYS should have had Mother testify on the transfer of Child's control, but it did not. This was why the ALJ complained that "there is simply no evidence presented by [CYS] that [Grandfather] was a perpetrator as that word is defined in the governing regulation." ALJ Adjudication at 11.

In our appellate review, this Court must determine whether the factual findings are supported by substantial evidence and the law has been properly applied. The county agency bears the burden of proving all of the essential issues in an expungement proceeding, and they must be addressed by the Department of Public Welfare. *See Manor v. Department of Public Welfare,* 796 A.2d 1020, 1030 (Pa.Cmwlth.2002). When this is not done, we are precluded from conducting meaningful appellate review. *Salters v. Pennsylvania State Police Municipal Police Officers' Education and Training Commission,* 912 A.2d 347, 355 (Pa.Cmwlth.2006) (agency adjudication must contain findings of fact which are sufficiently detailed so that this Court can conduct meaningful appellate review). Where the findings are not sufficiently detailed, remand is appropriate. *See Manor,* 796 A.2d at 1030.

The Secretary's final order does not contain specific findings of fact or express

credibility determinations. 2 Pa.C.S. § 507. The Secretary's single reference to the hearing transcript is too general to have meaning, particularly given the fact that most of the hearing testimony was found not credible by the ALJ who heard the testimony. Further, the Secretary's finding that Grandfather was alone with Child at the time the abuse occurred is not enough to make him a perpetrator. There must also be a finding that Mother transferred parental care to him.

For these reasons, I would vacate the Secretary's adjudication and remand the matter for specific findings of fact on who was present when the abuse occurred and whether Grandfather acted "in lieu" of Mother.

Judge BROBSON joins in this dissenting opinion.